IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **COAST CUTLERY CO.**, an Oregon corporation,<br><br>        Plaintiff,<br><br>        v.<br><br>**SIMPLE PRODUCTS CORPORATION**, a Utah corporation,<br><br>        Defendant. | Case No. 3:16-cv-0824-SI<br><br>**OPINION AND ORDER** |

Michael E. Haglund, Michael K. Kelley, and Eric J. Brickenstein, Haglund Kelley LLP, 200 S.W. Market Street, Suite 1777, Portland, OR 97201. Of Attorneys for Plaintiff.

Jeffrey J. Druckman and Janine C. Blatt, Druckman & Blatt, PC, 424 S.W. Iowa Street, Portland, OR 97239; Mark Bettilyon, Peter M. de Jonge, and Jed H. Hansen, Thorpe, North & Western, LLP, 175 South Main Street, Suite 900, Salt Lake City, UT 84111. Of Attorneys for Defendant.

**Michael H. Simon, District Judge.**

        Plaintiff Coast Cutlery Co. ("Coast") manufactures, distributes, and sells, among other items, small "portable light products" ("PLP"), such as flashlights and headlamps. Defendant Simple Products Corporation ("SPC") manufactures, distributes, and sells, among other items, flashlights under the brand name "Lux-Pro." Lux-Pro flashlights are in direct competition with

some of Coast's flashlights. Coast filed this action, alleging a claim under the Lanham Act[1] and a claim under state common law for interference with economic relations. Specifically, Coast alleges that SPC has been and continues falsely to represent certain performance attributes of some its Lux-Pro flashlights both to retail consumers and wholesale commercial purchasers such as Lowe's, Amazon.com ("Amazon"), and WalMart U.S. ("WalMart"). Coast further alleges that because of SPC's false or misleading representations exaggerating the performance of its Lux-Pro flashlights, Coast has suffered and will continue to suffer losses in sales and damage to its reputation and goodwill.

Coast seeks a preliminary injunction that: (1) enjoins SPC from selling several Lux-Pro models; (2) enjoins SPC from introducing new marketing, advertising, or promotional materials that misrepresent the attributes of Lux-Pro products; (3) orders SPC to remove all advertising and marketing materials that contain misrepresentations; (4) orders SPC to notify each of its commercial wholesale customers of all false or misleading representations; and (5) orders SPC to report to the Court and counsel for Coast the status of SPC's compliance with the requested injunction on a regular basis until all of SPC's obligations under the injunction are fulfilled. An evidentiary hearing was held on July 22, 2016. For the reasons discussed below, Coast's motion for preliminary injunction is DENIED.[2]

---

[1] 15 U.S.C. §§ 1051, *et seq.*

[2] Also before the Court is SPC's motion to strike the declarations of Robert Willhite and Gregory Windom. ECF 30. SPC argues that neither declarant is qualified to testify as an expert and that their declarations contain testimony that is either unreliable or not based on personal knowledge. SPC acknowledges that the Court has the discretion to consider inadmissible evidence in a preliminary injunction proceeding, but urges the Court to exercise its discretion to decline to consider these declarations. The Court declines to conduct a *Daubert* analysis of the challenged declarations or otherwise parse what testimony may or may not be admissible because even considering all of the challenged testimony, the Court finds that Coast is unable to meet its evidentiary burden to obtain a preliminary injunction. Accordingly, SPC's motion to strike is denied.

PAGE 2 – OPINION AND ORDER

## STANDARDS

A preliminary injunction is an "extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Defense Council, Inc.*, 555 U.S. 7, 22 (2008). A plaintiff seeking a preliminary injunction generally must show that: (1) he or she is likely to succeed on the merits; (2) he or she is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in his or her favor; and (4) that an injunction is in the public interest. *Id.* at 20 (rejecting the Ninth Circuit's earlier rule that the mere "possibility" of irreparable harm, as opposed to its likelihood, was sufficient, in some circumstances, to justify a preliminary injunction).

The Supreme Court's decision in *Winter*, however, did not disturb the Ninth Circuit's alternative "serious questions" test. *All. for the Wild Rockies v. Cottrell,* 632 F.3d 1127, 1131-32 (9th Cir. 2011). Under this test, "'serious questions going to the merits' and a hardship balance that tips sharply toward the plaintiff can support issuance of an injunction, assuming the other two elements of the *Winter* test are also met." *Id.* at 1132. Thus, a preliminary injunction may be granted "if there is a likelihood of irreparable injury to plaintiff; there are serious questions going to the merits; the balance of hardships tips sharply in favor of the plaintiff; and the injunction is in the public interest." *M.R. v. Dreyfus,* 697 F.3d 706, 725 (9th Cir. 2012) (citing *Cottrell*).

The already high standard for granting a preliminary injunction is further heightened when the type of injunction sought is a "mandatory injunction." *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (noting that the burden is "doubly demanding" for a mandatory injunction). To obtain a mandatory injunction, a plaintiff must "establish that the law and facts *clearly favor* her position, not simply that she is likely to succeed." *Id.* (emphasis in original). As explained by the Ninth Circuit:

PAGE 3 – OPINION AND ORDER

> A preliminary injunction can take two forms. A prohibitory injunction prohibits a party from taking action and "preserve[s] the status quo pending a determination of the action on the merits." *Chalk v. U.S. Dist. Court*, 840 F.2d 701, 704 (9th Cir. 1988); *see also Heckler v. Lopez*, 463 U.S. 1328, 1333 (1983) (a prohibitory injunction "freezes the positions of the parties until the court can hear the case on the merits"). A mandatory injunction orders a responsible party to take action. A mandatory injunction goes well beyond simply maintaining the status quo [p]endente lite [and] is particularly disfavored. In general, mandatory injunctions are not granted unless extreme or very serious damage will result and are not issued in doubtful cases or where the injury complained of is capable of compensation in damages.
>
> The *status quo ante litem* referenced in *Chalk* means the last, uncontested status which preceded the pending controversy.

*Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 878-79 (9th Cir. 2009) (quotation marks and citation omitted) (alterations in original).

## BACKGROUND

### A. PLP Products

Coast and SPC offer competing small PLP products with materially similar qualities and characteristics. Large wholesale buyers account for the majority of Coast and SPC's PLP sales, and such wholesale companies often allocate shelf space to one competing product to the exclusion of the other. Historically, the PLP industry did not have objective standards that would enable the evaluation of the performance of one product against another. Without such objective standards, buyers were left with only the subjective representations of sellers regarding the quality of PLP products.

### B. The Development of PLP Standards

In 2009, the American National Standards Institute, in collaboration with representatives from the PLP industry, including Coast, developed and approved objective standards for PLPs. These new standards, known collectively as ANSI/NIEMA FL-1 ("ANSI Standard"), established

PAGE 4 – OPINION AND ORDER

protocols for measuring and communicating important performance attributes of PLPs. The measured attributes include light output (known as lumens), brightness, beam distance, and run time. Industry participants who use ANSI Standard testing include labels on packaging and marketing materials that display "ANSI Ratings" with respect to one or more of the tested product's performance attributes. The PLP industry has widely adopted the ANSI Standards.

Following approval in 2009 of the ANSI Standards, industry participants formed the Portable Light American Trade Association ("PLATO"). Among other things, PLATO provides a mechanism for voluntary self-policing within the PLP industry. PLATO created an Oversight Committee, which investigates possible false or misleading advertising among industry participants, including alleged exaggerations of ANSI Ratings.

Coast was actively involved in the development of the ANSI Ratings and the formation of PLATO. Coast has been a member of PLATO since 2010 and has served on the Oversight Committee since July 2015.

## C.  Coast's Testing of SPC's Products

Coast alleges that beginning in at least 2014, SPC has grossly exaggerated the ANSI Ratings of many of its Lux-Pro products. Coast reaches this conclusion primarily through its own internal testing of Lux-Pro products. Coast tested certain Lux-Pro products to compare the test results with the representations SPC made on its product packaging and other marketing materials. Coast's in-house tests were conducted by its Technical Specialist, Robert Willhite. One of Mr. Willhite's responsibilities as a Technical Specialist is to conduct ANSI Standard testing on Coast's products. Mr. Willhite conducts this testing in a laboratory, following ANSI Standard testing protocols and using properly calibrated testing equipment. Mr. Willhite tested SPC's products in the same laboratory and using the same protocols that he uses to test Coast's

products. Pursuant to ANSI Standard protocols, Mr. Willhite tested three samples of each of the Lux-Pro products selected for testing.

In October and November 2014, Mr. Willhite conducted in-house testing on eight of SPC's products. Mr. Willhite found that each model underperformed in at least one of the tested criteria. Coast does not rely on this testing from 2014 to support its motion for a preliminary injunction.[3] Coast did, however, report the results of its testing to PLATO and the Oversight Committee, triggering some investigations discussed further below.

In August 2015 and April and May 2016, Mr. Willhite tested 15 Lux-Pro products, purchased from Amazon, Bi-Mart, Lowe's, and Fred Meyer. Mr. Willhite concluded that each product underperformed in a least one tested criteria. The following chart lists Mr. Willhite's test results based on the average result from the three tested samples:

| Model | Advertised light output (lumens) | Tested light output (lumens) | Advertised run time (hours) | Tested run time (hours) | Advertised beam distance (meters) | Tested beam distance (meters) |
|---|---|---|---|---|---|---|
| LP130 | 60 | 38 | 5 | 0.35 | 5 | 58 |
| LP200 | 90 | 83 | 2 | 1.5 | 10 | 76 |
| LP251 | 40 | 63 | 12 | 5 | 15 | 40 |
| PS318 | 30 | 19 | 6 | 10.25 | N/A | N/A |
| LP380 | 90[4] | 145 | 8[5] | 3 | 80 | 155 |
| LP390 | 40 | 44 | 12 | 9.25 | 15 | 35 |
| LP395 | 40 | 54 | 12 | 6.8 | 15 | 37 |
| LP400 | 120 | 117 | 4 | 2.7 | 120 | 177 |
| LP420 | 190 | 216 | 6 | 3.7 | 150 | 164 |
| LP470 | 200 | 232 | 6 | 2.5 | 120 | 116 |

---

[3] In Footnote 1 in its reply brief, Coast clarified that it only relies on testing conducted in 2015 and 2016 to support its motion for preliminary injunction. Thus, Coast is relying on 16 different products as being falsely represented (the 15 from Coast's 2015 and 2016 in-house testing plus one additional product, the LP1100 (Max 2D LXII) from the PLATO investigation).

[4] Mr. Willhite erroneously stated the advertised lumens was 120.

[5] Mr. Willhite erroneously stated that the advertised run time was 6.

PAGE 6 – OPINION AND ORDER

| Model | Advertised light output (lumens) | Tested light output (lumens) | Advertised run time (hours) | Tested run time (hours) | Advertised beam distance (meters) | Tested beam distance (meters) |
|---|---|---|---|---|---|---|
| LP500 | 250 | 323 | 6 | 4 | 200 | 239 |
| LP600 | 320 | 351 | 7 | 4.75 | 220 | 255 |
| LP630 | 290 | 284 | 7 | 0.85 | 150 | 124 |
| LP830 | 120 | 153 | 5 | 3.6 | 50 | 88 |
| XP900 | 850 | 773 | 2 | 1.3 | 220 | 174 |

### D. Discontinued Products

Two of the sixteen Lux-Pro product models challenged by Coast as underperforming have been discontinued without a product line replacement.[6] Four of the Lux-Pro models tested and challenged by Coast have been replaced or are being replaced with updated models.[7] These updated models contain some different electronic components from the previous model and in some cases make different claims regarding the product's ANSI Ratings. Coast did, however, purchase the tested models in April and May 2016, so to the extent they have been replaced with updated models, the tested versions were available to consumers as late as May 2016.

### E. PLATO's Investigations into SPC's Products

Coast reported its 2014 in-house testing results to PLATO and the Oversight Committee. The Oversight Committee currently has two ongoing investigations relating to Lux-Pro products. Although Coast is on the Oversight Committee, to avoid a conflict of interest, Coast is excluded from participating in the testing of Lux-Pro products in connection with the investigations.

#### 1. First Investigation

The Oversight Committee's first investigation involves two Lux-Pro products, the Mini Tac LX, Model LP200, and the Max 2D LXII, Model LP1100. In this investigation, the

---

[6] The discontinued models are the LP380 and LP400.

[7] The models with product replacements are the LP130, LP200, LP470, and LP630. It appears, however, that Coast tested the most recent model of the LP470.

PAGE 7 – OPINION AND ORDER

Oversight Committee had an independent testing company, Intertek Group Plc ("Intertek"), test three[8] samples of the challenged Lux-Pro products. Intertek conducted tests and issued reports on that testing in July 2015 and January 2016. *See* ECF 7-4.

### a. July 2015 tests

In July 2015, the product packaging of the LP200 represented that it had ANSI Ratings of 90 lumens, beam distance of 10 meters, and a run time of two hours. Intertek tested lumens and beam distance. For the LP200, Intertek found lumens ranged from 62 to 80, with an average of 73. Intertek found beam distance ranged from 62 to 70 meters, with an average of 69 meters. Intertek's testing thus showed that based on the three tested samples, the LP200 product packaging overrepresented lumens and underrepresented beam distance.

The product packaging of the LP1100 claimed lumens of 280, beam distance of 200 meters, and a run time of three hours. Intertek found lumens ranged from 192 to 255, with an average of 212, and beam distance ranged from 171 to 248 meters, with an average of 203 meters. The tests thus showed that the product packaging overrepresented lumens and accurately represented beam distances.

### b. October 2015 tests

After PLATO received Intertek's test results from July 2015, it contacted SPC regarding PLATO's concerns that the lumens rating was overrepresented for the two products at issue in the investigation. SPC then hired Intertek to conduct additional testing on the products. Intertek tested additional products provided to it by SPC in October 2015. These tests found for the

---

[8] For the January 2016 testing, Intertek states in the report summary that it received six samples, but the report only includes results from three samples and later in the report Intertek references "the three samples." ECF 7-4 at 1-10. It is unclear whether Intertek tested six samples and only reported on three, or whether Intertek tested only three samples. Regardless, results were reported for only three samples.

PAGE 8 – OPINION AND ORDER

LP200, in rounded numbers, lumens ranging from 97 to 107, with an average lumens of 100. The October 2015 tests found for the LP1100, in rounded numbers, lumens ranging from 356 to 368, with an average lumens of 360.

SPC provided these test results to PLATO, which expressed surprise regarding the inconsistent test results from the same testing agency (Intertek). PLATO then obtained additional testing from Intertek in January 2016.

### c. January 2016 tests

In Intertek's January 2016 tests, it tested lumens and run time. For the LP200, Intertek found lumens ranged from 47 to 73, with an average of 64. Intertek found run time ranged from two to four hours, with an average run time of three hours. As with the July 2015 tests, but unlike the October 2015 tests, lumens were overrepresented. Run time, however, was underrepresented.

The product packaging of the LP1100 claimed lumens of 280, beam distance of 200 meters, and a run time of three hours. Intertek tested lumens and run time. Intertek found lumens ranged from 208 to 245, with an average of 223, and run time ranged from 4.25 to 5 hours, with an average of 4.5 hours. Thus, lumens was again overrepresented on the product packaging and run time was underrepresented.

### d. Comparison to Coast's in-house testing

Coast tested the LP200 in both 2014 and 2016. Coast's in-house tests in 2014 found average lumens of 54, run time of 1.7 hours, and beam distance of 90 meters. Coast's in-house tests in 2016 found average lumens of 83, run time of 1.5 hours, and beam distance of 76 meters. A comparison of Coast's 2014 and 2016 test results with Intertek's 2015 and 2016 test results shows: Intertek found average lumens of 64 and 73 in its two tests whereas Coast found average lumens of 54 and 83; Intertek found average run time to be 3 hours whereas Coast found average run times of 1.5 and 1.7 hours; Intertek found average beam distance to be 69 meters whereas

PAGE 9 – OPINION AND ORDER

Coast found average beam distance to be 90 and 76 meters. Notably, this model is one that SPC identified as having at least one newer model, and so the differences between the 2014, 2015, and 2016 testing may be attributable to changes in components of the LP200.

Coast only tested the LP1100 in October 2014. Coast's tests found average lumens of 190, run time of 1.9 hours, and beam distance of 244 meters, compared with Intertek's findings of average lumens of 212 and 223, run time of 4.5 hours, and beam distance of 203 meters.

The following chart summarizes the average results from Coast's and Intertek's testing of the two products under investigation:

| LUMENS:[9] | | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| Model | Advertised | Coast 2014 Test | Coast 2016 Test | Intertek 7/15 Test | Intertek 10/15 Test | Intertek 1/16 Test |
| LP200 | 90 | 54 | 83 | 73 | 100 | 64 |
| LP1100 | 280 | 190 | None | 212 | 361 | 223 |
| | | | | | | |
| RUN TIME: | | | | | | |
| Model | Advertised | Coast 2014 Test | Coast 2016 Test | Intertek 7/15 Test | Intertek 10/15 Test | Intertek 1/16 Test |
| LP200 | 2 | 1.75 | 1.5 | None | | 3 |
| LP1100 | 3 | 1.85 | None | None | | 4.5 |
| | | | | | | |
| BEAM DIST.: | | | | | | |
| Model | Advertised | Coast 2014 Test | Coast 2016 Test | Intertek 7/15 Test | Intertek 10/15 Test | Intertek 1/16 Test |
| LP200 | 10 | 90 | 76 | 69 | None | None |
| LP1100 | 200 | 244 | None | 203 | None | None |

---

[9] For lumens, some test results are rounded and others are listed to the first or second decimal. For ease of comparison, when values are listed to the first or second decimal point the Court rounds to the nearest whole number.

PAGE 10 – OPINION AND ORDER

### 2. Second Investigation

The second investigation involves four Lux-Pro models, the LP630C, LP600C, LP500C, and LP470C. According to Gregory Windom, the General Manager of Coast, this investigation is focused on claimed run times and testing by the Oversight Committee is pending.

### F. SPC's Internal and Third-Party Testing of SPC's Products

SPC conducts testing on its products throughout product development and the manufacturing process. SPC conducts both in-house testing, and hires different independent testing firms. SPC uses Intertek, Centre of Testing Service International ("CTS") and SGS-CSTC Standards Technical Services Co., Ltd. ("SGS"). SPC contends that it uses three independent testing laboratories because small changes in how testing is conducted can result in significant differences and SPC believes using three different laboratories will increase the confidence level and randomness of the test results. With respect to the 16 challenged products, SPC provided the Court with various internal and external test results.

### G. Summary of Test Results

The following charts compare all of the various testing of the challenged products provided by the parties to the Court.[10]

---

[10] The Court includes Coast's 2014 testing as applicable on the 16 challenged products because although Coast does not expressly rely on that testing for its preliminary injunction, it offers those test results "as further evidence of SPC's longstanding practice of false advertisement." ECF 31 at 2 n.1. Further, the consistency and repeatability of test results is relevant to the Court's analysis regarding whether the facts clearly show that SPC misrepresents the ANSI Ratings of its products. Accordingly, the Court considers all provided tests results on the 16 challenged products.

PAGE 11 – OPINION AND ORDER

**LUMENS**[11]

| Model | Advertised Lumens | Coast Test Results | SPC Test Results | Intertek Test Results | CTS Test Results |
|---|---|---|---|---|---|
| LP130 | 60<br>new version claims 40 | 38 | new version 42 | | |
| LP200 | 90<br>new version claims 100 | 54, 83 | 96[12] | 73, 100, 64<br>new version 107 | |
| LP251 | 40 | 63 | 43 | | |
| PS318 | 30 | 19 | 31 | | |
| LP380 | 90 | 145 | | | 90 |
| LP390 | 40 | 44 | 43 | | |
| LP395 | 40 | 54 | 41 | | |
| LP400 | 120 | 117 | | | |
| LP420 | 190 | 216 | | | 195 |
| LP470 | 200<br>earlier version claims 180 | 232<br>earlier version 162 | | | earlier version 185 |
| LP500 | 250 | 201, 323 | | 366, 353 | 262 |
| LP600 | 320 | 239, 351 | | 389 | 323 |
| LP630 | 290<br>new version claims 300 | 276, 284 | | new version 308 | 288 |
| LP830 | 120 | 153 | 138 | | |
| XP900 | 850 | 773 | 867 | | |
| LP1100 | 280<br>new version claims 320 | 190 | 301,[13] 292<br>new version 320 | 212, 361, 223<br>new version 362 | 285 |

---

[11] For lumens, some test results provided to the Court are rounded and others are listed to the first or second decimal. For ease of comparison, when values were provided at the first or second decimal point, the Court rounds to the nearest whole number.

[12] The SPC internal test reports three values: 101.12, 93.23, and 93.31. Because other test results are based on averages, the Court averages those three results, for an average of 95.87, which the Court rounds to 96.

[13] The SPC internal test reports two values: 287.3 and 313.8. Because other test results are based on averages, the Court averages those two results, for an average of 300.55, which the Court rounds to 301.

PAGE 12 – OPINION AND ORDER

**RUN TIME (hours)**

| Model | Advertised Run Time | Coast Test Results | SPC Internal Test Results | Intertek Test Results | CTS Test Results |
|---|---|---|---|---|---|
| LP130 | 5 new version- no claim | 0.35 | new version 3.1 | | |
| LP200 | 2 new version claims 2.5 | 1.75, 1.5 | | 3 | |
| LP251 | 12 | 5 | 12 | | |
| PS318 | 6 | 10.25 | 4.8, considered faulty | | |
| LP380 | 6 | 3 | | | 8 |
| LP390 | 12 | 9.25 | 12 | | |
| LP395 | 12 | 6.8 | 12 | | |
| LP400 | 4 | 2.7 | | | |
| LP420 | 6 | 3.7 | | | 6 |
| LP470 | 6 earlier version claims 6 | 2.5 earlier version 1.7 | | | earlier version 6 |
| LP500 | 6 | 1.1, 4 | | 17, 7.2 | 6 |
| LP600 | 7 | 0.7, 4.75 | | 6.75 | |
| LP630 | 7 new version claims 5 | 0.6, 0.85 | | new version 5.5 | 7 |
| LP830 | 5 | 3.6 | 5.6 | | |
| XP900 | 2 | 1.3 | 2 | | |
| LP1100 | 3 new version claims 3.5 | 1.85 | new version 3.8 | 4.5 | 3 |

**BEAM DISTANCE**

| Model | Advertised Beam distance | Coast Test Results | SPC Internal Test Results | Intertek Test Results | CTS Test Results |
|---|---|---|---|---|---|
| LP130 | 5 new version- no claim | 58 | | | |
| LP200 | 10 | 90, 76 | | 69 | |
| LP251 | 15 | 40 | | | |
| PS318 | | | | | |
| LP380 | 80 | 155 | | | 80 |
| LP390 | 15 | 35 | | | |

PAGE 13 – OPINION AND ORDER

| Model | Advertised Beam distance | Coast Test Results | SPC Internal Test Results | Intertek Test Results | CTS Test Results |
|---|---|---|---|---|---|
| LP395 | 15 | 37 | | | |
| LP400 | 120 | 177 | | | |
| LP420 | 150 | 164 | | | 160 |
| LP470 | 120 earlier version claims 120 | 116 earlier version 125 | | | earlier version 140 |
| LP500 | 200 | 182, 239 | | 234, 214 | 205 |
| LP600 | 220 | 196, 255 | | 243 | |
| LP630 | 150 new version claims 200 | 113, 124 | | new version 224 | 170 |
| LP830 | 50 | 88 | | | |
| XP900 | 220 | 174 | | | |
| LP1100 | 200 | 244 | | 203 | 230 |

**H. Timing of this Action**

Coast asserts that after it discovered SPC's allegedly misleading statements, Coast elected to use the self-policing mechanism of PLATO and the Oversight Committee. Coast reported its findings to PLATO and PLATO contacted SPC. Coast states that SPC indicated that it would cooperate with the Oversight Committee. Coast, therefore, was hopeful that SPC would voluntarily correct the allegedly misrepresenting statements in the relevant Lux-Pro products' advertising and product packaging or improve the quality of the product to match the claimed ANSI Rating. Thus, contends Coast, it waited to file a lawsuit so that that issue could be resolved without litigation through PLATO's self-policing mechanism. Only after Coast determined that SPC did not intend to change its product packaging and other marketing materials did Coast file the pending lawsuit.

**I. Coast's Alleged Damages**

Coast asserts that ANSI Ratings are critically important to wholesale buyers and retail customers. Coast alleges that because SPC markets certain Lux-Pro products as having better

PAGE 14 – OPINION AND ORDER

ANSI Ratings that the products actually have, wholesale and retail buyers are switching to purchasing Lux-Pro products instead of Coast's products. Coast contends that SPC is using inferior materials and manufacturing methods, which are cheaper than those used by Coast, producing an inferior product, and misrepresenting it as a superior product in direct competition with SPC's necessarily more expensive products. Coast alleges that purchasers are being deceived into believing that Coast and SPC's products have similar ANSI Ratings and because SPC's products are less expensive purchasers are choosing to, unknowingly, buy inferior SPC products. Coast alleges that the purported misrepresentations by SPC have resulted in Coast losing sales to consumers and large wholesale purchasers such as Lowe's. Specifically, Coast alleges that in 2014 Lowe's relied on SPC's misrepresentations to eliminate two of Coast's flashlights from Lowe's product line and to replace them with Lux-Pro products. Coast contends that as a result, it lost $1.2 million in sales to Lowe's in a 12-month period.

Coast argues that losing shelf positioning in large stores such as Lowe's damages Coast's reputation and competitive position because consumers assume brands with a large "shelf" presence are the leading brands. Coast further alleges that it is in danger of losing its premium sales position at other large retailers such as Amazon and Walmart if SPC is allowed to continue falsely to represent the quality of Lux-Pro products. Coasts asserts that it is suffering harm to its business reputation, goodwill, business relationships, and competitive positioning and that such harm is irreparable and cannot be adequately compensated with monetary damages.

## DISCUSSION

The first factor that Coast must establish to obtain a preliminary injunction is that it is likely to succeed on the merits. *Winter*, 555 U.S. at 20. As noted above, however, this burden is heightened when the injunction sought is a mandatory injunction. *Garcia*, 786 F.3d at 740; *Marlyn Neutraceuticals*, 571 F.3d at 878-79. Because Coast is not seeking an injunction to

PAGE 15 – OPINION AND ORDER

maintain the status quo but instead is seeking an injunction requiring SPC to take affirmative action, such as removing products, changing product packaging and marketing materials, and contacting customers, Coast is requesting a mandatory injunction. Mandatory injunctions are "particularly disfavored" and will not issue in "doubtful cases." *Marlyn Neutraceuticals*, 571 F.3d at 879. Coast must therefore meet a "high" evidentiary burden to demonstrate that the requested injunction is warranted. *Thalheimer v. City of San Diego*, 645 F.3d 1109, 1115 (9th Cir. 2011); *see also Garcia*, 786 F.3d at 740.

This dispute centers on whether SPC has made and continues to make false or misleading representations about the ANSI Ratings of the 16 challenged Lux-Pro flashlights. Coast contends that the test results show that the products actually perform below the stated ANSI Rating. The test results conducted by the parties and third-party laboratories, however, reach variious results. Some of the tests demonstrate that SPC's representations are exaggerated and other tests demonstrate that SPC's representations are accurate or understated. The parties debate the efficacy and reliability of each other's internal tests and offer opposite interpretations of the inconsistent test results.

Coast argues that its internal test results are more reliable because it purchased SPC's products from a retail store, the same as a normal consumer, whereas SPC selectively chooses which of its products to submit for testing. Coast also emphasizes that it helped develop the ANSI Standards and conducts its tests according to proper protocols. Coast further argues that the inconsistencies in its test results and third-party test results are best explained by SPC's use of inferior components that perform inconsistently and SPC's selective choosing of products to test.

PAGE 16 – OPINION AND ORDER

SPC responds that its results are more reliable and are more consistent with the third-party testing. SPC argues that the inconsistent test results, including inconsistencies between Coast's 2014 and 2016 testing, show that Coast does not use proper testing protocols and cannot achieve repeatable test results. SPC challenges minor technicalities in Coast's testing, such as the fact that Mr. Willhite did not round the run time as is set forth in the ANSI Standards. SPC also argues that Coast's testing is demonstrably inaccurate because the Lux-Pro battery run time tested longer than the "fresh" Duracell battery run time, when one would expect the opposite result. Duracell batteries are "premium" batteries and would be expected to last longer, and the Lux-Pro products have a "try me" function that if used will deplete its battery life. Thus, argues, SPC, the fact that in Coast's testing the Lux-Pro products had longer run times with Lux-Pro batteries is an indication that Coast's testing is unreliable.

What these disputes and arguments show, and what can readily be seen by looking at the Court-prepared charts of the provided testing on the challenged products, is that the facts do not *clearly favor* Coast. *Garcia*, 786 F.3d at 740. There are tests that support Coast's allegations but there are also tests that support SPC's representations. Indeed, given the evidence before the Court, Coast fails to establish even the lesser evidentiary burden that it is likely to succeed on the merits of its claims. The significant inconsistency with testing, even from the same laboratory, raises some doubt regarding whether SPC misrepresented the performance standards of its products. For example, Intertek tested lumens for the two products at issue in PLATO's first investigation three times and had different test results all three times. Although Coast argues that this shows that SPC uses inferior components and selectively chooses its products, Coast did not provide evidence clearly showing that its contentions are correct, as opposed to specific

PAGE 17 – OPINION AND ORDER

inaccuracies in those particular tests or inherent inaccuracy in the ANSI Standard testing.[14] Whether Coast's testing and Intertek's testing when hired by PLATO should be considered more accurate and reliable than the testing conducted by SPC and third parties when hired by SPC remains in dispute. There is insufficient evidence at this time to make "a clear showing" that testing by SPC and the laboratories it hires are unreliable. *Winter*, 555 U.S. at 22.

Coast suggests that if the Court does not find the evidence sufficient to issue a preliminary injunction, the Court should appoint a neutral technical expert to test all the challenged products. Coast states that it agrees to be bound by the test results of any court-appointed expert. But a motion for a preliminary injunction is an "extraordinary remedy," which requires a clear showing that that the plaintiff is entitled to relief. *Id.* at 22. Here, the burden to make that showing is on Coast. *See Thalheimer*, 645 F.3d at 1115-16 (noting that "the moving party bears the burden of showing likely success on the merits—a high burden if the injunction changes the status quo before trial" and "that the burden of proof at the preliminary injunction phase tracks the burden of proof at trial"); *Preminger v. Principi*, 422 F.3d 815, 823 n.5 (9th Cir. 2005) ("At the preliminary injunction stage, Plaintiffs have the burden of proof."). Faced with such conflicting evidence, it is not the Court's burden to marshal additional evidence. The burden of proof is on Coast. If Coast prevails at trial, the Court might consider whether a special master or technical expert would be appropriate to ensure compliance with any resulting permanent injunction, but such considerations by the Court are premature at this stage of the proceedings. Because the Court finds that Coast fails to meet its heightened burden in requesting a mandatory injunction to show that that the facts clearly favor Coast and it is likely to succeed on the merits, the Court does not address the remaining *Winter* factors.

---

[14] Coast does not, for example, provide testing of individual components from multiple samples of the same product model.

PAGE 18 – OPINION AND ORDER

## CONCLUSION

Coast has failed to meet its high burden to establish that the facts clearly support a mandatory preliminary injunction. Accordingly, Coast's motion for a preliminary injunction (ECF 4) is DENIED. SPC's motion to strike (ECF 30) is DENIED.

**IT IS SO ORDERED**.

DATED this 25th day of July, 2016.

/s/ Michael H. Simon
Michael H. Simon
United States District Judge