1            IN THE UNITED STATES DISTRICT COURT

2                FOR THE DISTRICT OF OREGON

3                    PORTLAND DIVISION

4
   COAST CUTLERY CO., an Oregon    )
5  corporation,                    )
                                   )
6                     Plaintiff,   )  Case No. 3:16-cv-00824-SI
                                   )
7             v.                   )
                                   )  July 22, 2016
8  SIMPLE PRODUCTS CORPORATION,    )
   a Utah corporation,             )
9                                  )
                      Defendant.   )  Portland, Oregon
10 _____)

11

12

13

14

15                  EVIDENTIARY HEARING

16             TRANSCRIPT OF PROCEEDINGS

17        BEFORE THE HONORABLE MICHAEL H. SIMON

18           UNITED STATES DISTRICT COURT JUDGE

19

20

21

22

23

24

25

```
 1                            APPEARANCES

 2   FOR THE PLAINTIFF(S):
                             MICHAEL E. HAGLUND
 3                           Haglund Kelley LLP
                             200 SW Market Street
 4                           Suite 1777
                             Portland, OR 97201
 5
     FOR THE PLAINTIFF(S):
 6                           ERIC J. BRICKENSTEIN
                             Haglund Kelley LLP
 7                           200 SW Market Street
                             Suite 1777
 8                           Portland, OR 97201

 9   FOR THE DEFENDANT(S):
                             MARK M. BETTILYOU
10                           Thorpe North & Western, LLP
                             175 South Main Street
11                           Suite 510
                             Salt Lake City, UT 84111
12
     FOR THE DEFENDANT(S):
13                           PETER M. DE JONGE
                             Thorpe North & Western, LLP
14                           175 South Main Street
                             Suite 510
15                           Salt Lake City, UT 84111

16   FOR THE DEFENDANT(S):
                             JED HANSEN
17                           Thorpe North & Western, LLP
                             175 South Main Street
18                           Suite 510
                             Salt Lake City, UT 84111
19
     FOR THE DEFENDANT(S):
20                           JANINE C. BLATT
                             Druckman & Blatt, PC
21                           0424 SW Iowa Street
                             Portland, OR 97239
22

23   COURT REPORTER:      Jill L. Jessup, CSR, RMR, RDR, CRR
                          United States District Courthouse
24                        1000 SW Third Avenue, Room 301
                          Portland, OR 97204
25                        (503)326-8191
```

1                                    INDEX

2  WITNESSES:                                        PAGE:

3   ROBERT WILLHITE

4   Direct Examination                                6

5   Cross-Examination                                15

6   Redirect Examination                             35

7   Recross-Examination                              37

8   GREGORY WINDOM

9   Direct Examination                               38

10  Cross-Examination                                45

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    TRANSCRIPT OF PROCEEDINGS

 2           THE COURT:  Good afternoon, Your Honor.

 3           DEPUTY COURTROOM CLERK:  Your Honor, this is the time

 4   set for an evidentiary hearing in Civil Case 16-824-SI.  Coast

 5   Cutlery Co. v. Simple Products Corporation.

 6       Could I have counsel in court, beginning with plaintiff,

 7   please identify yourself for the record.

 8           MR. HAGLUND:  Mike Haglund and Eric Brickenstein for

 9   plaintiff.

10           THE COURT:  Good afternoon.

11           MS. BLATT:  Janine Blatt, Mark Bettilyon, Jed Hansen,

12   and Peter de Jong for Defendants.  And with us today is the CEO

13   of Simple Products Brian Christensen.

14           THE COURT:  Good afternoon.  All right.  I have read

15   your materials that you've sent to me, and I do have a few

16   questions; but I understand that you have some matters that you

17   would like to show me.  So if you would like to begin with

18   that, you're welcome to.

19       It's plaintiff's motion, so you may proceed.

20           MR. HAGLUND:  Your Honor, we would like to call two

21   of our witnesses for brief supplemental testimony given the

22   debate back and forth.

23           THE COURT:  That's fine.

24           MR. HAGLUND:  Plaintiff's first witness is

25   Rob Willhite.
```

1          MR. BETTILYON:  Your Honor, we would just like to at

2    least formally object.  We believe that we should have received

3    more advanced warning regarding these issues than having it

4    presented here today.  We think it's unfair.

5        I should note to the Court that one issue we had is our

6    expert couldn't be here today.  We knew that when we hired him

7    because he had a vacation planned, but given the short time

8    frames, we had no choice.  We feel like we're at a serious

9    disadvantage to have new facts or information come into the

10   record at this point.

11          THE COURT:  I understand.

12       I have not a clue what Mr. Willhite will be saying.  Do

13   you?

14          MR. BETTILYON:  Not really.

15          THE COURT:  Then let's hear what he has to say, and

16   afterwards you can tell me whether you think it's unfairly

17   prejudicial or whether it's just dotting some I's and crossing

18   some T's.

19          MR. BETTILYON:  All right.  Thank you, Your Honor.

20          THE COURT:  You may proceed.

21          MR. HAGLUND:  Mr. Willhite, could you come forward

22   and be sworn?

23

24   ///

25   ///

Willhite - D

1              ROBERT WILLHITE,

2     called as a witness in behalf of the Plaintiff, being first

3     duly sworn, is examined and testified as follows:

4

5              DEPUTY COURTROOM CLERK:  Please state your name and

6     spell your last for the record.

7              THE WITNESS:  Robert Willhite.  W-I-L-L-H-I-T-E.

8

9                      DIRECT EXAMINATION

10    BY MR. HAGLUND:

11    Q.   Mr. Willhite, you've filed two declarations in this

12    matter, and there's some -- in light of the record, I just have

13    a few follow-up questions for you.

14         First, what percentage of your time do you devote as an

15    employee of Coast Cutlery to product testing?

16    A.   A hundred percent.  That's all I do.

17    Q.   Is it any particular line of products or all products?

18    A.   I test a number of different products.  We test our own

19    flashlights, of course; but I also have tested, I believe,

20    every major brand name of flashlight out there.

21    Q.   So the testing work you do is flashlight testing?

22    A.   That's correct.

23    Q.   Okay.  And could you briefly describe what is the nature

24    of the lab that you referenced in your declarations that

25    Coast -- that you work in at Coast Cutlery?

Willhite - D

1   A.    Well, we have a self-contained -- it's a portable unit.

2   Actually, it's 40 feet, I believe, by 12, completely separated

3   from the building.  It's got it's own HVAC controls and

4   lighting controls.  It's -- it contains a number of pieces of

5   equipment for testing, like an integrating sphere -- a

6   labsphere, integrating sphere, a couple of Konica Minolta

7   illuminating spheres, otherwise known as lux meters.

8   Q.    You were describing the equipment?

9   A.    Right.

10  Q.    Slowly relate what you --

11  A.    So I have a labsphere, integrating sphere with all the

12  associated accessories, a couple of lux meters, illuminance

13  meters, and, you know, that's really about it.

14        It's basically just measuring equipment for doing a number

15  of different types of tests for flashlights.

16  Q.    Now, does this lab have any windows?

17  A.    It does not.

18  Q.    And what's the reason for that?

19  A.    Because the ambient lighting is supposed to be less than

20  one lux while you're conducting tests, so we have to have the

21  ability to shut off the lights and block out all of the light.

22  Q.    Can you provide an estimate of what the total company

23  investment is in this laboratory?

24  A.    It's probably upwards of 60-, $65,000 or so.

25  Q.    Okay.  Now, are you familiar with the ANSI protocol that

Willhite - D

1    applies to testing portable light products?  Also, most folks

2    know them as flashlights.

3    A.    Yes.

4    Q.    What are the ANSI requirements, as it pertains to the lab

5    conditions when testing is being done?

6    A.    The lab conditions temperature has to be 22 Celsius, plus

7    or minus three degrees, a relative humidity of 50 percent

8    nominal; so, in other words, the target percentage is

9    50 percent.  Some environmental, you know, issues could

10   fluctuate slightly, but the target is 50 percent.

11        In terms of testing, while the tests are being performed,

12   as I said before, ambient lighting needs to be less than one

13   lux.

14   Q.    And I just want to ask you a few questions about the tests

15   that are done to test for brightness in terms of flashlight

16   brightness, beam distance, and run time.

17   A.    Uh-huh.

18   Q.    First, as to brightness, what are you measuring when you

19   try to determine, under the ANSI standard, of what the

20   brightness of the product is?

21   A.    Right.  When you measure brightness of a flashlight,

22   you're measuring the total light put -- light output that comes

23   out of the front of the flashlight.  So you need an integrating

24   sphere.  That is basically a ball -- it's a sphere, obviously,

25   that's coated with a highly reflective material on the inside

Willhite - D

1   that allows the light to kind of bounce around in there until

2   in becomes homogenous so that you can tell what the actual

3   light output is in terms of total light output.

4       It uses a spectrometer, which is a fancy scientific

5   instrument that has, you know, the ability to look at the

6   entire visible spectrum, which is between 790 or -- I'm sorry,

7   380 and 790 nanometers and basically gives you the overall --

8   Q.   And what is the metric or measurement unit that brightness

9   is measured in?

10  A.   It's reported in lumens.

11  Q.   We see the reference to -- "lumens" is what is often

12  advertised on flashlight product packaging?

13  A.   One of the things, correct.

14  Q.   Okay.  Now, with respect -- there's a statement in

15  Mr. Christensen's declaration that the run time and beam

16  distance can be extrapolated from the lumens measurement.

17      Do you agree with that, in your experience?

18  A.   No, not at all.

19  Q.   Can you extrapolate beam distance and run time from the

20  lumens test?

21  A.   No.

22  Q.   How do you -- very briefly, how do you test for beam

23  distance?

24  A.   Beam distance has to be tested --

25      I'm watching you.  Sorry.

Willhite - D

1      It has to be tested using some sort of light measurement

2  device that can measure light out or -- or measure lux, and lux

3  is the measurement of light over an area.  It happens to be one

4  lux equals the light that spreads over one square meter of

5  area.

6      So use a lux meter receptor that's on a wall and, per the

7  ANSI standard and guidelines, it tells you that you can measure

8  this either from 210 or even longer meters in distance.  I use

9  two meters because it's the easiest to set up.  I've got a

10 tripod and basically just shoot the flashlight at the lux

11 meter.

12     Now, you have to find the beam intensity.  If you imagine

13 a flashlight, even a good flashlight, like a Coast flashlight,

14 for instance, it has a very even-beam quality.  If you shine it

15 on a wall, you'll see that there's dark spots and light spots;

16 but with the lux meter, you have to find the brightest spot of

17 the flashlight because you need to get the peak beam intensity.

18     Once you've determined what the peak beam intensity is,

19 you can apply a formula that basically extrapolates that out to

20 meters in beam distance.

21 Q.   Okay.

22 A.   But in pure lumens you wouldn't be able to do that

23 without -- you know, without being able to know what -- first

24 of all, I know of no way to convert lumens to lux.  If there is

25 one, I don't know of it.

Willhite - D

1  Q.    Okay.  Let me shift to run time.  How do you --

2              THE COURT:  Can I interrupt one second.  Can you tell

3  me one more time, slowly, the difference between lux and

4  lumens.

5              THE WITNESS:  Yes.  Lux is a measurement of light

6  intensity over an area.

7              THE COURT:  One moment.

8              THE WITNESS:  Lumens --

9              THE COURT:  One moment.

10              THE WITNESS:  Oh, I'm sorry.

11              THE COURT:  Okay.

12              THE WITNESS:  And lumens is a measurement of total

13  light output.

14              THE COURT:  Got it.  Thank you.

15        Thank you.  You may continue.

16  BY MR. HAGLUND: (Continuing)

17  Q.    And, one, lumens corresponds with what consumers view as

18  flashlight brightness?

19  A.    Correct.

20  Q.    And lux is the measuring device to determine the distance

21  that the beam will travel?

22  A.    Well, lux, using a formula applied, like I said, can

23  convert that to peak beam intensity and candela.  And candela

24  is actually the measurement of one specific angle of a

25  flashlight beam which ends up being the peak beam intensity; in

Willhite - D

1   other words, the brightest spot.  That's really what it means

2   in laymen's terms.

3   Q.   Okay.

4   A.   Once you determine what the brightest spot is, you can

5   extrapolate, using math, how far the beam will shine in meters.

6   Q.   Now, how do you measure run time in your laboratory and

7   according to the ANSI standard?

8   A.   There are a couple of ways that we measure it.  According

9   to the ANSI standard, you simply turn the flashlight on, wait

10  30 seconds, and take your first measurement right at 30

11  seconds.

12       With that measurement, it doesn't matter what measurement

13  it's in.  It could be lumens, if you want, or lux.  It just

14  needs to be an indication of the brightness.

15       Then what you do is you basically take a measurement

16  periodically -- the standard says periodically, but we do it

17  every 30 seconds -- until the flashlight diminishes in output

18  to 10 percent of whatever that initial measurement was.

19       So, as an example, if I use a -- an integrating sphere and

20  I measure a hundred lumens at 30 seconds after the light's on,

21  once it gets down to 10 percent, according to the ANSI

22  standard, that's the end of the run time, and then you

23  calculate how long that was.

24  Q.   And do you have -- are these testing devices hooked up to

25  any sort of data processing or computers in order to assemble

Willhite - D

1  and record the data?

2  A.   Yes.   Each -- each measuring device has its own computer

3  dedicated to that specific device or set of devices, depending

4  on what it is, and each device also within the software has

5  time stamps that allows me to spread the measurements to 30

6  seconds.

7  Q.   Now, in your supplemental declaration, you clarified that

8  all of the tests you made in the last couple of months, in

9  2016, of Lux-Pro flashlights, was -- were -- those tests were

10 all performed with fresh batteries; is that correct?

11 A.   That's correct.   "Fresh," to me, means new and unused

12 batteries.

13 Q.   Now, why, under the ANSI standard, is it important to use

14 fresh or unused batteries?

15 A.   It's pretty evident to me that if you use a used battery

16 you will not get the full performance out of a light.   So you

17 have to use the freshest, newest batteries, as if a consumer

18 had just put fresh batteries in it, and that's the performance

19 they can expect when they turn it on.

20 Q.   Now, last question:   If one tests a number of products

21 within their production line that are a particular model --

22 let's say you take five flashlights that you have secured from

23 your Chinese manufacturer and you test them all in these

24 various categories that we've discussed here -- lumens or

25 brightness, beam distance, and run time -- and you get

Willhite - D

1  inconsistent as opposed to consistent, results in those three

2  different categories.  If that's what you get when you do the

3  testing, what, in your experience, Mr. Willhite, does that

4  suggest to you about your products?

5  A.   I mean, it might suggest that different components are

6  used, possibly, from different manufacturers, different

7  tolerance levels, possibly even different chip bins.  The LED

8  chips, even within the same model number of the chip, will have

9  different bins, which basically essentially means grades of

10 chips.  So that could be one instance.

11 Q.   Just to clarify that, when you use the word "bins," how is

12 it spelled?

13 A.   B-I-N.

14 Q.   So it's like "bin"?

15 A.   Uh-huh.

16       THE COURT:  And what is it?

17 BY MR. HAGLUND: (Continuing)

18 Q.   What is it?

19 A.   When LEDs are manufactured, even, like I said, within the

20 same model that they're manufacturing -- like, for instance, a

21 XP-G2 -- sorry.  I'm just a fast taker.  There are different

22 qualities -- or, I'm sorry, different levels of performance

23 within those chips.  The way they make chips -- and I'm not an

24 expert in chip manufacturing.  As I understand, it's that

25 they -- they actually put them on a wafer, and the ones that

Willhite - D/X

1    are more close to the center have a higher performance.

2              THE COURT:  Hold it.

3              MR. BETTILYON:  Objection, Your Honor.  I don't know

4    that he's been qualified to have any technical expertise in

5    this particular area, and I would object to the testimony.  In

6    fact, he says it's his understanding.  He doesn't have the

7    expertise.

8              THE COURT:  I understand, and I will hear it with

9    that objection in mind.  I'll overrule the objection.  I still

10   want know what a bin is.

11             MR. BETTILYON:  All right.

12             THE WITNESS:  Simply put, the certain -- certain

13   chips within that wafer that they're producing will have higher

14   performance than the other ones.  So they have to separate them

15   into bins for basically selling purposes so that -- you know,

16   for marketing purposes, really.

17             THE COURT:  Okay.

18             MR. HAGLUND:  That's all the questions I have for

19   Mr. Willhite, Your Honor.

20             THE COURT:  Cross-examination.

21

22                        CROSS-EXAMINATION

23   BY MR. BETTILYON:

24   Q.   Yes.  Mr. Willhite, you're the technical specialist; is

25   that correct?

Willhite - X

1  A.    Correct.

2  Q.    How long have you had that title?

3  A.    Since June of 2014.

4  Q.    June of 2014.  And do you use LinkedIn at all,

5  Mr. Willhite?

6  A.    I have a LinkedIn profile.  I don't know what's on it.

7  Q.    Okay.  Because your LinkedIn profile indicates you're the

8  e-commerce sales and online marketing administrative --

9  A.    Yes, that's what I was before this, yes.

10        THE COURT REPORTER:  I'm sorry.  I didn't get all of

11  what you said.

12        THE COURT:  We all have to make sure that, for our

13  transcript purposes, let the questioner finish the question and

14  then the answer.  The witness will speak, and we'll make sure

15  no one asks a follow-up question until the witness is done

16  speaking.

17      Thank you, all.

18  BY MR. BETTILYON: (Continuing)

19  Q.    All right.  So your LinkedIn profile, if --

20        MR. BETTILYON:  Can I approach the witness,

21  Your Honor.

22        THE COURT:  You may.

23  BY MR. BETTILYON: (Continuing)

24  Q.    Your LinkedIn profile indicates that you're the e-commerce

25  sales and online marketing administrator.  Is that incorrect?

Willhite - X

1   A.    It's incorrect now, yes.

2   Q.    All right.  Is that just because you haven't updated that?

3   A.    That's correct.

4   Q.    Do you want to -- is that -- so that's what -- so you

5   haven't been on LinkedIn for two years to correct that?

6   A.    I -- I don't know.

7   Q.    Okay.

8           THE COURT:  Mine still says my old law firm, but I

9   can't get out of it.  I want to turn it off, but that's a

10  different issue.

11          MR. BETTILYON:  Does it still say that?  All right.

12  BY MR. BETTILYON: (Continuing)

13  Q.    So this is a new job for you?

14  A.    Since June of 2014.

15  Q.    It's your testimony that since June of 2014, to the

16  present, all you do is -- is check Coast products and the

17  competitor products.  That's all you do?

18  A.    Yes.  I'm -- I'm the testing person there.  A technical

19  specialist.  That's all I do.

20  Q.    Do you keep records regarding those tests?

21  A.    In most cases, yes.

22  Q.    Is there any reason why you didn't provide more precise

23  dates on some of the testing that you performed on the products

24  of my client?

25  A.    I don't know.  There's no reason I can think of, no.

Willhite - X

1    Q.    Do you take photographs of the products you test?

2    A.    Do.

3    Q.    Do you have sales receipts of the products you test?

4    A.    We do.

5    Q.    And you could have provided those to us in advance of

6    filing this motion?

7    A.    I don't see any reason why I couldn't have.

8    Q.    What kind of test do you keep?  Where do you keep them?

9    A.    I'm sorry.  What was the question?

10    Q.    What kind of test results do you keep?

11    A.    All of the test results.

12    Q.    Every test result that you've ever done on any product

13    you've kept?

14    A.    I think -- I think what you're asking me is that if every

15    single test that I perform I keep documents of that test.  The

16    answer is no.

17    Q.    All right.  What makes you decide what test results you

18    keep and what rest results you don't?

19    A.    It depends on what it is.  If my boss comes in and says,

20    "Hey, I just bought this flashlight.  It looks pretty cool.

21    How many lumens does it have?" then I pop in this sphere and I

22    tell him how many lumens it has.  I don't necessarily record

23    that.  I just tell him how many lumens it has.

24    Q.    All right.  Have you kept all the test results of every

25    product for Simple Products that you've tested?

Willhite - X

1    A.    I believe so, yes.

2    Q.    You have all of those?  And where are they?

3    A.    In -- in my computer.

4    Q.    So you have an individual -- do you have -- you've seen

5    some of the exhibits that we provided, I assume.  Have you

6    looked at the exhibits that we produced?

7    A.    I think so.

8    Q.    Okay.  And you've seen the test results that we've

9    provided and the test report for each flashlight?  Have you

10   seen those?

11   A.    I've seen one of those, yes.

12   Q.    Have you provided -- do you have something similar to that

13   in your computer for each test that you've done?

14   A.    Yes, I have.  I don't have an official report.  They're

15   just -- it's raw data.  So I save the raw data in an Excel

16   spreadsheet file for each -- for each one, yes.

17   Q.    So you don't keep test reports -- you don't have test

18   reports like those that we've provided to the Court?

19   A.    No.  I wasn't -- I wasn't prepared to -- I mean, it wasn't

20   as -- as -- an ordered test report, like, for instance, if we

21   were going to, you know, present it to a retailer or something

22   like that.  It's just internal data that I was collecting which

23   I saved.

24   Q.    So you don't have any contemporaneously created test

25   report like those we provided --

Willhite - X

1   A.   No, I don't.

2   Q.   -- that you could give to the Court today?

3   A.   No.

4   Q.   And, instead, you have some kind of an Excel spreadsheet

5   with some information in there.  Could you tell me the precise

6   date that you conducted every test that is at issue here in

7   this case?

8   A.   Yes.

9   Q.   And how would you get that?  You would have to look at

10  your Excel spreadsheet and look at it and figure that out?

11  A.   Because the run time software that I use has time stamps,

12  including the date.

13  Q.   So you would have to look at that date in order to figure

14  out the date you took the test?

15  A.   Yes, sir.

16  Q.   And how are you going to know which flashlight or version

17  of flashlight you tested?  Do you keep a photograph of the

18  flashlight?  Do you correlate it?

19  A.   Yes.  I've taken photographs of every flashlight that I've

20  tested and -- I've taken photographs of every Lux-Pro light

21  that I've tested.

22  Q.   You have the pictures, but what I want to know, how are

23  you going to line up the picture with the actual test?  Can you

24  do that?

25  A.   I believe so, yes.  I --

Willhite - X

1   Q.   How would you do it?

2          THE COURT:  Let's give a little bit more time between

3   the question and answer.

4          MR. BETTILYON:  I'm sorry, Your Honor.

5   BY MR. BETTILYON: (Continuing)

6   Q.   How would you do it?

7   A.   Well, it's strict recordkeeping.  It's -- there's no magic

8   trick to be able to say that I tested this flashlight on this

9   date.  I've labeled the flashlights.  I've taken photographs of

10  the flashlights.  I don't think that I can actually prove that

11  this exact flashlight that's in my hand was in this run time

12  box at this exact time.  There's no way to -- to prove that

13  100 percent.

14         THE COURT:  But can you correlate a photograph of

15  flashlight X with an entry in your spreadsheet of your testing

16  of a particular flashlight?

17         THE WITNESS:  I believe so because I've labeled each

18  flashlight with, you know, the retailer that I purchased it

19  from and the date that it was purchased, even if it was, you

20  know, Fred Meyer, purchased May of 2016, or whatever.  And I

21  don't -- I don't have multiple flashlights from -- like, for

22  instance, if I label it, "Fred Meyer, 5 of 2016," that's the

23  only Fred Meyer LP630, or whatever model I have, that would be

24  from that -- that test period, if you know what I'm saying.

25  ///

Willhite - X

1   BY MR. BETTILYON: (Continuing)

2   Q.   Have you kept the packaging with the run time information

3   on it?

4   A.   Yes, I have.

5   Q.   And do you have photographs of that as well or just the

6   packaging?

7   A.   Yes, I do.

8   Q.   Which?  Both?

9   A.   Both.

10  Q.   Okay.  So it's your -- because you haven't provided me --

11  on your Exhibit B chart you provide to the Court, you haven't

12  identified the specific date you purchased any of those

13  flashlights; correct?

14  A.   Okay.

15  Q.   Well, is that -- I think that's -- is -- that's accurate,

16  isn't it?

17  A.   I don't know.

18  Q.   You haven't looked at your Exhibit B chart?

19        MR. BETTILYON:  Do you mind if I approach the bench,

20  You Honor?

21        THE COURT:  No.  You may.

22  BY MR. BETTILYON: (Continuing)

23  Q.   Can you tell me, as you sit here today, what product

24  you -- what day you purchased the LP130 from Amazon?

25  A.   No.

Willhite - X

1  Q.   Can you tell me, as you sit here today, the day you

2  purchased the LP200 from Amazon?

3  A.   The answer to all of these is no.

4  Q.   No.

5       So you're not prepared to provide that information today.

6       Do you know who from Amazon you purchased the products

7  from?  You just bought it from Amazon?

8  A.   The internet.

9  Q.   The internet.  Okay.  You bought it from the internet.

10           THE COURT:  Can I interrupt for one second?

11      So the dates that are on Exhibit B of the supplemental,

12  that's the date you did the testing; correct?

13           THE WITNESS:  They were purchased and tested at

14  roughly the same time.  Like, within a week of each other.  So

15  when I see -- see something that says "May of '16," it was both

16  purchased and tested in May of '16.

17           THE COURT:  No, but some of these dates are specific

18  dates in your Exhibit B of your supplemental declaration.  This

19  says Exhibit A.  Sorry.  In your Exhibit A of your supplemental

20  declaration you have specific dates, like, LP130, Amazon,

21  5/18/2016.  Was that date intended to signify the date of the

22  test?

23           THE WITNESS:  I -- I don't believe so.  I -- I

24  didn't -- I don't think I had a specific method for recording

25  those.

Willhite - X

1        Typically, what I do is when I write the report -- so, in

2   other words, when I gather all the data together and put it in

3   the master report, the spreadsheet, I put the date that I do

4   that.  When I've -- when I've collected all the data together

5   and put it in one summary, what I call that is a testing

6   summary.

7              THE COURT:  Okay.  So that date that I find on that

8   chart, that's the date that you prepared or completed that

9   entry for the testing?

10             THE WITNESS:  It typically would be that; although, I

11  couldn't guarantee that.

12             THE COURT:  Okay.  Thank you for letting me

13  interrupt.

14             MR. BETTILYON:  No problem.

15  BY MR. BETTILYON: (Continuing)

16  Q.   Let me ask you:  You talked about run time and you said

17  that you could test that either using lumens or lux.  Is that

18  your testimony?

19  A.   That's correct.

20  Q.   Will you get different results if you use lumens or lux?

21  A.   No.

22  Q.   It should be exactly the same result.  That's your

23  testimony?

24  A.   It -- it -- you're going to have some variation from test

25  to test because circuitry and batteries, you know, allow for

Willhite - X

1   slight differences; but, for the most part, you'll get exactly

2   the same result as you would --

3   Q.   Do you know that because you have done a test, or do you

4   just know that because you think that's the case?

5   A.   Oh, no.  I've tested both ways numerous times, hundreds of

6   times.

7   Q.   Have you given some of your test results to some of your

8   salespeople?

9   A.   I don't -- I don't think so.  I -- I have not.

10  Q.   Do you know if others in the organization have given some

11  of the Coast test results to salespeople?

12  A.   I don't think so.  I don't know that.

13  Q.   All right.  So if I have witness testimony that I can

14  proffer to this Court at some point in the future saying that

15  Coast has provided tests of Simple Products to customers,

16  that's false?  That's inaccurate?

17  A.   As I said before, I don't know that.  I did not provide

18  it, and I don't know -- I have no knowledge of anybody else

19  providing it.

20  Q.   Well, you're a small company, aren't you?  How many people

21  are in your company?

22  A.   20?  30?  I don't know.

23  Q.   And it's your testimony that here on the stand today that,

24  to your knowledge, Coast has never provided any test results of

25  Simple Products to any customers?

Willhite - X

1    A.    That's not what I said.  What I said is I have no

2    knowledge of that and I didn't do it myself.

3    Q.    Okay.  Are you familiar with Intertek?

4    A.    Yes.

5    Q.    And are you familiar with SPC?

6    A.    Not really, no.

7    Q.    But you understand both of them are testing organizations?

8    A.    I am.

9    Q.    And do they provide accurate test results, in your

10   opinion?

11   A.    It depends.

12   Q.    And why does it depend?

13   A.    Depending on what location you get test results from and

14   the lab itself, I think -- I think my -- my belief is that

15   depending on what lab and the -- the strictness with which

16   their lab technicians follow protocols will influence test

17   results.

18   Q.    Have you visited those labs?

19   A.    No.

20   Q.    All right.  So but what you're telling me is that

21   different labs may come up with different results?

22   A.    Correct.

23   Q.    Is that dependent on the equipment they're using?

24   A.    Could be.

25   Q.    Is it dependent on the person doing the test?

Willhite - X

1    A.    Absolutely.

2    Q.    Is it dependent on the type of flashlights they might use?

3    A.    No.

4    Q.    Is it your opinion that you're the only person in the

5    world who can perform ANSI tests properly?

6    A.    Don't know how you could have gotten --

7    Q.    So you agree there are other people who can do --

8    A.    Absolutely.

9          THE COURT REPORTER:  I'm sorry.  One at a time.  And,

10   between you both, please slow down.

11         THE COURT:  It is Friday afternoon.  Let's give Jill

12   a break.

13   BY MR. BETTILYON: (Continuing)

14   Q.    So there are other people who can do those tests properly,

15   but it's your belief that there can be a lot of variation

16   depending on who performs the test, how it's performed, if the

17   batteries are proper, and that sort of thing.  Is that right?

18   A.    That's true.

19   Q.    Okay.  If I had test results that showed -- that I had

20   obtained from Intertek that showed that Coast Products failed

21   the lumens test, do you think that would be sufficient evidence

22   for this Court to enter a preliminary injunction against those

23   Coast products?

24         MR. HAGLUND:  Objection.  Calls for a legal

25   conclusion.

Willhite - X

1              THE COURT:  Sustained.

2         You may rephrase.

3    BY MR. BETTILYON: (Continuing)

4    Q.    All right.  Do you believe that --

5              THE COURT:  Ask him generally how reliable do you

6    think that result would be.

7    BY MR. BETTILYON: (Continuing)

8    Q.    How reliable do you think the test results would be from

9    Intertek?

10   A.    As I said, it depends.  Intertek also has offices in Asia

11   which I found are not that reliable, but they also have a lab

12   in New York which we found to be pretty reliable.  We haven't

13   found any major problems from them.

14   Q.    All right.  So if we had tests that were from the New York

15   lab, you would say those were pretty reliable tests?

16   A.    I would say they're pretty indicative, yeah.

17   Q.    And those would at least be -- the Court should give at

18   least equal weight to those tests as it would give to the tests

19   that you performed?

20             THE COURT:  You know --

21             THE WITNESS:  I'm not a lawyer.

22   BY MR. BETTILYON: (Continuing)

23   Q.    Okay.  Let me -- I want to hand you, if I could, a

24   declaration.  I want to show you some test results that we have

25   for Coast Products, and I want to talk to you about them if I

Willhite - X

1  could.

2       And if I could provide the Court with a copy as well.

3            THE COURT:  Is this Mr. Christensen's declaration?

4            MR. BETTILYON:  This is a supplemental declaration,

5  Your Honor.  It's new.  We haven't yet provided it to anyone.

6       You know what?  That might be -- I may have my

7  highlighting on one of those copies.

8            THE WITNESS:  I'll have that one.

9            MR. BETTILYON:  I may have given it to --

10           THE COURT:  That's the one I wanted.

11           MR. BETTILYON:  I probably gave it to opposing

12  counsel.

13  BY MR. BETTILYON: (Continuing)

14  Q.  I would like you to -- if you could look through the test

15  results.

16           THE COURT:  By the way, do you happen to have a

17  second copy of this?

18           MR. BETTILYON:  Yes, I do.  For the law clerk?  Oh,

19  yes.

20  BY MR. BETTILYON: (Continuing)

21  Q.  You would agree with me, wouldn't you, that -- that we

22  have test results which show flashlight products sold by Coast

23  that failed the lumen test; isn't that correct?

24  A.  I don't -- I don't know that.

25  Q.  Why don't you look at Exhibit A and tell me what Exhibit A

Willhite - X

1    is.

2              THE COURT:  Is this the supplemental declaration?

3              MR. BETTILYON:  Yes.

4              MR. HAGLUND:  Your Honor, I -- I guess I have an

5    objection to this line of testimony, and I'm sure that it's

6    appropriate.  The declaration speaks for itself.  Just to

7    elicit whether the --

8              THE COURT:  It depends on what the question is.

9    Overruled.  We'll take it question by question.

10        Obviously, this is not the best use of time to ask this

11   witness just to take me through this declaration which I will

12   read, but if you have a specific question or two for him, by

13   all means, you may ask.

14   BY MR. BETTILYON:  (Continuing)

15   Q.   All right.  Do you have any reason, looking at these test

16   results, to question their accuracy?

17             THE COURT:  This is from the New York lab of

18   Intertek.

19             MR. BETTILYON:  Correct, Your Honor.

20             THE WITNESS:  Well, if I'm reading this correctly --

21   well, did you possibly combine two reports here?

22   BY MR. BETTILYON:  (Continuing)

23   Q.   There were several reports.

24   A.   One says 310 lumens on high, and then it also says 61

25   lumens and 71 lumens and 66 lumens.

Willhite - X

1   Q.   Let's look at one report.  Let's have you turn to the page

2   after Exhibit A, which is the fourth page in the document, and

3   just look at that report.  And that's the first one.

4        And I'll acknowledge to you that only two flashlights were

5   tested; but, apart from the fact that only two instead of three

6   were tested, are there any other issues that you see with the

7   way this test was performed or the results of it?

8   A.   I'm sorry.  I need time to look at this.  I'm not -- I'm

9   not understanding the --

10  Q.   Well, just --

11  A.   You said look at the page directly after Exhibit A; right?

12           MR. BETTILYON:  May I, Your Honor?

13           THE WITNESS:  This would be the report page, and it

14  doesn't have any data on it.

15  BY MR. BETTILYON: (Continuing)

16  Q.   Well, it's a report.  Have you seen reports like this

17  before from Intertek?

18  A.   No.  I've never seen one of these.

19           THE COURT:  Mr. Willhite, I think he was referring to

20  the report that begins right after Exhibit A.

21           THE WITNESS:  What page would you like me to look at?

22  BY MR. BETTILYON: (Continuing)

23  Q.   I would like you to look at this entire report and tell me

24  just -- just through here, until you get to the photo, those

25  pages -- if there's anything that strikes you as being

Willhite - X

1  irregular about the information or data contained in that

2  report.

3          THE COURT:  You will be filing this in the future in

4  the court docket; right?

5          MR. BETTILYON:  We will, Your Honor.

6          THE WITNESS:  What I find irregular about this is

7  that it uses -- it's -- it seems to show a light output average

8  of 310 lumens and, yet, for the run time it only shows a

9  starting lumen output of 61 and 71, and I'm not sure how you

10  could convert 310 to 66 lumens average for run time.

11  BY MR. BETTILYON: (Continuing)

12  Q.   Okay.  So you have some problem with the run time.  You

13  don't have any problem with the lumens results?  They appear to

14  be accurate?

15  A.   Oh, they're low.

16  Q.   And they show that your product doesn't pass; correct?

17  A.   Of these two pieces, yes, on average.

18          MR. BETTILYON:  Okay.  No further questions,

19  Your Honor.

20          THE COURT:  Mr. Willhite, before we get back to

21  Mr. Haglund for any follow-up, a couple details I want to

22  clarify with you, please.

23      As I was reading your first declaration, I saw that you

24  did some result -- you did some testing of Lux-Pro products in

25  2014.  I understand that they're not the basis for this, but

1    you did some testing in 2014; right?

2            THE WITNESS:  Yes, sir.

3            THE COURT:  Then I read a lot about your testing that

4    you did in -- I think it was April and May of 2016; right?

5            THE WITNESS:  Uh-huh.

6            THE COURT:  Did you do any testing of Lux-Pro

7    products in 2015?

8            THE WITNESS:  Yes, sir.

9            THE COURT:  Okay.  I see that there's a reference in

10   your supplemental declaration, Exhibit A to that, to a testing

11   summary that appears to be dated August -- August of -- it says

12   8/2015.  Is that the testing you're referring to?

13           THE WITNESS:  Yes, sir.

14           THE COURT:  Was there any other testing you did of

15   Lux-Pro products in 2015 besides that one test in August of

16   2015?

17           THE WITNESS:  I did a number of lights in August of

18   2015.  I believe five or possibly six models.

19           THE COURT:  Okay.  Now, here is my question:  I see

20   that in Exhibit A to your supplemental declaration there was a

21   lot of testing dates from April and May of 2016.  There is that

22   one from August of 2015.  It's on -- if you look at the court

23   docket, it's on page 14 of 16 -- or Exhibit A, page 14.

24       And so when I look at that and I see that there was that

25   test that you are giving me in August of 2015 and then I look

1    at your supplemental declaration at paragraph 6, you wrote,

2    "The specimens tested during April and May of 2016, as

3    referenced in Exhibit B to my prior declaration" -- and there's

4    also some of the August 2015 in your prior declaration -- "were

5    purchased from the identified retailers by Coast immediately

6    prior to testing."

7        I understand what you're saying.  I get it.

8        The last sentence of your paragraph 4 in your supplemental

9    declaration says, "I purchased all 2016 testing with brand new,

10   fresh Duracell batteries."  I understand that.

11       I was struck by the fact that you don't tell me one way or

12   the other whether your August 2015 testing was done with brand

13   new, fresh Duracell batteries.  You don't tell me that those

14   were purchased from the retailers immediately prior to testing.

15       Am I correct in inferring that that means that they

16   weren't?

17           THE WITNESS:  No.  They were.

18           THE COURT:  Why didn't you tell me in the

19   supplemental declaration anything at all about your August 2015

20   testing when you tell me that all of your 2016 testing were

21   done with brand new, fresh Duracell batteries and with products

22   purchased immediately prior to testing?

23           THE WITNESS:  Possibly an oversight.  But the fact

24   that they're calling into question whether or not there were

25   fresh batteries used and -- I believe that we are focusing

1    most -- most on what's in the -- what's in the marketplace

2    right now, so I -- just an oversight, I think.

3          THE COURT:  Okay.  Got it.  Fair enough.

4      Back to you, Mr. Haglund.

5

6                    REDIRECT EXAMINATION

7    BY MR. HAGLUND:

8    Q.    Mr. Willhite, you still have the supplemental Christensen

9    declaration up there?

10   A.    Yes, sir.

11   Q.    If you look at Exhibit A, which is the first of the

12   Intertek reports testing Coast flashlights, is there any

13   indication on this report that they did -- other than that they

14   used fresh batteries in performing the test?

15        The only thing that would indicate to me that they did not

16   is if you look at the description of the sample on page 1 of

17   that report.  It says that the client submitted two production

18   samples in original and unopened packaging of model number

19   Coast HP7.  Samples were received by Intertek on May 27, 2016,

20   in undamaged condition, and the two samples were tested as

21   received.

22   A.    I don't see anything on here about batteries.

23   Q.    When one is testing a flashlight to determine whether or

24   not it meets the ANSI standard or not, what does the protocol

25   require relative to batteries?

A.    Fresh batteries that are of the same type -- I'm sorry,
brand or type.  I don't think it says "brand," actually.  I
can't recall exactly, but the same type of battery that
comes -- that is supplied with the flashlight.

     Now, with these "test it" packages, a lot of these lights
can be inadvertently turned on by either -- either through
shipping -- like, for instance, I -- we've had products that
were for sale in Amazon where they get turned on in the
warehouse and consumers get them with dead batteries or at
least diminished batteries.  You have to be careful not to use
the batteries that are included in any package that uses "test
it" or "try me" or anything like that.

Q.    Because the "try me" feature on the packaging allows the
consumer to actually turn it on --

A.    Correct.

Q.    -- and look at how bright or how it performs?

A.    Yes, sir.

          MR. HAGLUND:  Thank you.  No further questions.

          MR. BETTILYON:  One.

          THE COURT:  Mr. Bettilyon -- am I pronouncing it
right?  "Bettilyon"?

          MR. BETTILYON:  "Bettilyon," but it's okay.  I've
bean called better and worse.

          THE COURT:  I'll try for "Mr. Bettilyon."
Mr. Bettilyon.

<u>RECROSS-EXAMINATION</u>

BY MR. BETTILYON:

Q.    It's your testimony that these are from the New York lab,

correct, these test results?  Aren't they?  If you look at the

first page of Exhibit A, it's the Cortland, New York, test

facility; correct?

          MR. HAGLUND:  We'll stipulate to that, Your Honor.

BY MR. BETTILYON: (Continuing)

Q.    Doesn't it also say on that first page that they were done

in accordance with the ANSI FL1-2009 Flashlight Basic

Performance Standard.  Do you see that?

A.    Yes.  Those are the standards used.  I finally found the

page you were asking me about.

Q.    Right.  Okay.  So that would indicate they used fresh

batteries, doesn't it?  They used the ANSI standard?

A.    Not necessarily.

Q.    So if they say they're using the ANSI standard, you don't

think they should be believed?

A.    I said "standards used."  I don't know whether they used

the included batteries within the client pack or not.

Q.    So you believe that maybe further factual inquiry would be

necessary to establish those kinds of facts and information?

A.    I don't know.  You're using lawyer language on me.

Q.    All right.  The judge got it, so --

          THE COURT:  I'm used to lawyer language.

Windom - D

1          MR. BETTILYON:  No further questions.

2          THE COURT:  Anything further, Mr. Haglund?

3          MR. HAGLUND:  No, Your Honor.

4          THE COURT:  Mr. Willhite, thank you very much, sir.

5     You may step down.

6          THE WITNESS:  All right.

7          THE COURT:  Anything further, Mr. Haglund?

8          MR. HAGLUND:  Coast Cutlery calls Greg Windom now for

9     brief testimony.

10                    GREGORY WINDOM,

11    called as a witness in behalf of the Plaintiff, being first

12    duly sworn, is examined and testified as follows:

13

14         DEPUTY COURTROOM CLERK:  Thank you.  You may be

15    seated.  State your name for the record and spell your last.

16         THE WITNESS:  My name is Gregory Windom.

17    W-I-N-D-O-M.

18

19                    DIRECT EXAMINATION

20    BY MR. HAGLUND:

21    Q.   Mr. Windom, you filed a -- we filed a 16-page declaration

22    that you signed in early June, and in that declaration you make

23    multiple observations about the PLP or portable light product

24    flashlight industry in the United States.  Why do you feel

25    qualified to make those observations that are in your

Windom - D

1  declaration?

2  A.    I've worked in the industry for 13 years.  The last five

3  or six of those years I've been the general manager of Coast.

4  During that time, the company has almost tripled in size.  I've

5  developed products that are widely sold in the portable

6  lighting industry in the United States as well as dozens of

7  countries outside the United States.

8  Q.    And you mentioned the growth of the flashlight product

9  line at Coast Cutlery during that -- since 2009, is it?

10  A.    Approximately.

11  Q.    And at the point where you began your work as general

12  manager in '09 through '15, could you give the Court a rough

13  estimate, in millions of dollars, of the volume of flashlights

14  sold by Coast at the beginning and then in 2015?

15  A.    Approximately, 18 million, beginning this period.  And

16  then this year I anticipate a little bit more than 50 million.

17          THE COURT:  Sorry.  We are talking dollars.  Not --

18          THE WITNESS:  We're talking U.S. dollars in revenue.

19  BY MR. HAGLUND: (Continuing)

20  Q.    Okay.  Now, in paragraph 4 of your declaration, there's a

21  sentence that I wanted to ask you if you needed to make a

22  correction to what it says.  It comes -- the sentence comes

23  after you offer your opinion that the approximate gross sales

24  of flashlights in the United States annually is approximately

25  1.4 billion.  And immediately after that first sentence of

Windom - D

1  paragraph 4 you say the following, "The three largest PLP

2  distributors, including Home Depot, Wal-Mart, and Lowe's,

3  account for approximately one-third of that amount."

4      Is that a correct statement?

5  A.   That's not correct.  What I meant was those were the top

6  three distributors in terms of Coast customers.  That is as a

7  percentage of Coast revenue, not the broader industry revenue.

8  Sorry about that.

9  Q.   So that was -- okay.  Thank you.

10     Now, there's a statement in Mr. Christensen's declaration

11 that consumers do not consider run time or flashlight run time

12 to be a significant attribute of a flashlight.  Do you agree

13 with that?

14 A.   I 100 percent disagree.  I firmly disagree with that

15 statement.

16 Q.   Can you explain why?

17 A.   Because what use would a flashlight be if it used the

18 batteries in one minute?  A flashlight needs to shine for a

19 usable period of time.  That usable period needs to be defined

20 by the user, the consumer, what they want to use their

21 flashlight for.  Some consumers may want a very bright

22 flashlight that lasts for two hours of run time, others may

23 need a flashlight that lasts eight hours of run time; so run

24 time is very important.

25     Also, why would an industry create a standard for run time

Windom - D

1    that's agreed upon by all of the companies in the industry if

2    it's not an important metric or measuring of a flashlight's

3    performance.

4    Q.    Are there segments of the U.S. consumer market for

5    flashlights for which run time is a very significant feature?

6    A.    Absolutely.   There are segments.   There are markets.   In

7    general, the --

8              MR. BETTILYON:   Objection.   Foundation, Your Honor.

9              THE COURT:   Sustained.   You may first lay a

10    foundation.   Ask him how he knows.

11    BY MR. HAGLUND: (Continuing)

12    Q.    How is it that you know the identity of segments of the

13    flashlight market in the United States that -- for which run

14    time is important?

15    A.    We sell portable lighting products into multiple segments

16    of the U.S. market, and segments are all different in certain

17    ways.   So certain segments that service professional users --

18    when I say "professional," I mean men and women who use their

19    flashlight or their headlamp on the job day in and day out.

20    They're heavy users.   They use it for hours every day or night.

21    Those users, in general, are going to be more focused on

22    balancing between the light output and run time because they're

23    going to use their flashlight a lot and burn their batteries

24    out and they are not going to want to buy new batteries every

25    day or two.

Windom - D

1        THE COURT:  This may seem like a simplistic question,

2    and it probably is, but how do you know that?

3        THE WITNESS:  We sell millions and millions of

4    flashlights every year to thousands of different customers in

5    the United States.  We talk to people.  I personally attend a

6    number of industry trade shows.  We talk to a lot of end users,

7    a lot of customers, and we get a flavor for the different types

8    of users of our products.

9        THE COURT:  Okay.  Thank you.  You may proceed.

10        MR. HAGLUND:  Thank you, Your Honor.

11    BY MR. HAGLUND: (Continuing)

12    Q.    Now, as you -- you're familiar with the ANSI standards

13    that apply to flashlights in the U.S.?

14    A.    Yes, I am.

15    Q.    As a marketer of those -- as a producer and marketer of

16    those products, flashlights, is a seller of flashlights

17    required to list a specified number of the ANSI standards on

18    their packaging?

19    A.    No.  As a manufacturer, you are allowed to select which

20    ANSI standards you want to put on your package.  So back to

21    your question about run time, if you don't deem run time an

22    important aspect of a flashlight's performance, there's no rule

23    stating you have to put it on your package.  You can just leave

24    it off and stick with light output.

25    Q.    Where is it that Coast sources the flashlights that it

Windom - D

1   sells in the United States?

2   A.    We manufacture all of our flashlights in China.

3   Q.    And what is your opinion about the importance of quality

4   control in connection with a production or a supply chain that

5   begins with manufacture in China?

6   A.    It's critically important.  You need to make sure, as an

7   importer/reseller of products, that you are -- the products

8   that you are purchasing from your contract manufacturer in

9   China meet the specifications and quality standards that you

10  lay out.

11       If you don't have a process in place to ensure that, you

12  are leaving it up to the goodwill of this Chinese factory to

13  ship you a product that they may have told you, in an email,

14  you're going to receive in a container; but there's no way to

15  verify that that product meets the specifications you require

16  unless you have a process to test it yourself.

17  Q.    Could you briefly describe what Coast has had in place for

18  years to ensure quality control in the flashlights that it

19  sources from China for resale here in the U.S.?

20  A.    Yeah.  In addition to the lab that Mr. Willhite described

21  earlier -- that's the lab that we use to test our products to

22  create our official specifications -- we also have an office in

23  Hong Kong staffed with quality control personnel whose job it

24  is to fly or drive into various parts of Mainland China, where

25  our contract manufacturers are located, inspect all of our

Windom - D

1  shipments of product before they leave the Chinese factory and

2  get to us to make sure that they meet our quality standards.

3  Q.   Now, are your products tested for lumens or brightness,

4  run time, and other attributes at the factory in China?

5  A.   All of our factories have testing equipment inside the

6  factory and occasionally they will test our product; but we

7  never ever use those test results as our official performance

8  specification for our products.  I have never seen a

9  factory-level test that matches the test reports that we have

10 in our lab.

11 Q.   And so, in your experience, are the test reports from the

12 Chinese factories manufacturing flashlights for Coast reliable

13 indicators of the flashlight's actual performance in these

14 various ANSI categories?

15 A.   No.  The only thing we use those tests for are relative

16 performance.  If we're working on trying to make a product

17 brighter, we make a modification in the factory, have them run

18 a test.  If their test equipment says it's brighter than their

19 test equipment -- the same test equipment said it was before,

20 then we'll make an assumption that the product itself is

21 brighter.

22 Q.   But in terms of what you use to determine what you are

23 comfortable representing to consumers on the packaging as the

24 attributes of the products you sell in the United States, what

25 do you rely on?

Windom - D/X

1   A.    100 percent we rely on our own test results, our own lab.

2           MR. HAGLUND:  No further questions, Your Honor.

3           THE COURT:  Cross-examination.

4

5                          CROSS-EXAMINATION

6   BY MR. BETTILYON:

7   Q.    Mr. Windom, you first became aware that Simple Products

8   weren't passing tests in 2014; isn't that correct?

9   A.    That's correct.

10  Q.    And you had further tests that were performed in 2015; is

11  that correct?

12  A.    I believe so.  But I don't recall those details.  Sorry.

13  Q.    And then you had more tests performed in 2016; isn't that

14  correct?

15  A.    Correct.

16  Q.    Okay.  And, for whatever reason, you waited until now to

17  file this lawsuit, didn't you?

18  A.    I can give you a very clear reason why we waited to file

19  the lawsuit.  We --

20  Q.    I'm just telling you -- I'm asking you if you waited until

21  now, despite having test results in 2014, to file this

22  litigation?  Two years later; correct?

23  A.    We turned over this case to an industry trade organization

24  with the hopes and intentions that they would clear up these

25  discrepancies with Simple Products.  Apparently, that was not

Windom - X

1   going to happen, so we were forced to file this.

2           THE COURT:   The trade organization was PLATO; right?

3   BY MR. BETTILYON: (Continuing)

4   Q.    You're referring to PLATO?

5   A.    Right.

6   Q.    And have you, or anyone under your direction, provided

7   some of these test reports to customers of Coast?

8   A.    I have not, and no one under my direction has.

9   Q.    So if I have copies of test reports that are in the hands

10  of customers, they didn't come from Coast?  They came from some

11  other source?  Is that what you're telling me?

12  A.    I don't know where they came from.

13  Q.    Have you informed customers that Simple Products weren't

14  passing tests?

15  A.    I have not informed customers.

16  Q.    Do you know if anyone working for your company has done

17  that?

18  A.    I believe one person has.

19  Q.    And who was that?

20  A.    That would be the owner of the business.  Dave Brands.

21  Q.    So Mr. Brands has provided -- do you know if he provided

22  test results to customers?

23  A.    I don't know if he's provided test results.  I provided

24  test results to him.  It's possible he may have discussed that

25  with customers.

Windom - X

1   Q.   Okay.  And would it be fair to say, if those kinds of

2   conversations have taken place, customers can do what they

3   want?  Right?  They can make a decision about whether these

4   allegations are material.  Are they relevant?  Do they care or

5   not care?  Customers can make that decision, can't they?

6   A.   You would have to ask the customer that.

7   Q.   Well, it sounds like you have had conversations -- someone

8   in the organization has -- but you're not here -- you're not

9   able to tell me what the results of those communications were?

10  A.   No.

11  Q.   Okay.  So the owner of the company had those

12  communications with customers and did not share with you what

13  the customer said?

14  A.   No.

15  Q.   So you know that there have been such conversations.  You

16  just don't know how they turned out?

17  A.   I don't know if there's been conversations.  There might

18  have been.  I don't know how they turned out if they did

19  happen.

20  Q.   Well, what's the basis of saying you know but you don't

21  know?  What are we talking about here?

22  A.   Could you be a little bit more clear?

23  Q.   Have you had conversations with the owner regarding

24  communications he's had with customers?

25  A.   I have not.  I have informed him of the test results of

Windom - X

1    the Lux-Pro flashlights and left it up to him to discuss that

2    with the customer.  If he did or didn't, I'm not sure.

3    Q.    Do you know when you gave him test results?  Starting in

4    2014?

5    A.    Yes.

6    Q.    Okay.  So the owner of the company has known since 2014

7    and may or may not have shared test results with customers?

8    A.    Correct.

9    Q.    Okay.  And since 2014, to today, your sales have gone up

10   substantially; correct?

11   A.    Correct.

12   Q.    By a metric of several tens of millions of dollars;

13   correct?

14   A.    Correct.

15   Q.    And let's talk about consumers.  You mentioned that one

16   segment of the consuming public -- would be, like, law

17   enforcement -- would care about how -- run time; is that

18   correct?

19   A.    Correct.

20   Q.    Are there stores where policemen and firemen buy their

21   products?

22   A.    There -- there are outlets that tailor their product

23   selection to law enforcement officers.  Whether or not law

24   enforcement officers actually buy their flashlights from those

25   sources or anywhere else they choose to in this country, I

Windom - X

1  don't know.

2  Q.    If I'm a police officer and I want to buy a -- I want to

3  buy a really -- I need a better flashlight than the guy going

4  on a camping trip, I go to a special store to make sure I'm

5  getting top quality product; correct?

6  A.    I can't -- I'm not a police officer.  I -- you know, I --

7  and to make a general assumption about all police officers --

8  I'm certain that there are some police officers that do what

9  you described and I'm sure there are some other ones that hop

10  down to Lowe's or Home Depot to buy a flashlight.

11  Q.    Well, you're surmising; correct?

12  A.    Yeah.

13  Q.    You don't have any test or study that shows where

14  policemen buy their products, do you?

15  A.    No.

16  Q.    You don't have any test to tell me what percentage of

17  customers that go to Lowe's care about run time, do you?

18  A.    No.

19  Q.    You don't have any test to show where any customer going

20  to any general brick and mortar retail store, how many of them

21  care about run time, do you?

22  A.    No.  But I do have plenty of tests that show that your

23  client's run times are grossly overstated on their packaging.

24  Q.    Well, that's your testimony.  We have plenty of studies

25  that we have provided to the Court that have demonstrated

Windom - X

1  otherwise.  Have you looked at that?

2  A.   I don't know.

3  Q.   Did you not look at any of the exhibits we provided to the

4  Court?

5  A.   I looked at what my attorney gave me.

6           MR. BETTILYON:  Okay.  All right.  Nothing further.

7           THE COURT:  Anything further, Mr. Haglund?

8           MR. HAGLUND:  No, Your Honor.

9           THE COURT:  Thank you, Mr. Windom.  You may step

10  down, sir.

11           THE WITNESS:  Thank you.

12           THE COURT:  Any further witnesses, Mr. Haglund?

13           MR. HAGLUND:  No, Your Honor.

14      I did forget at the outset to reference that the CEO and

15  owner of Coast Cutlery, David Brands, is seated right next to

16  Mr. Willhite, so --

17           THE COURT:  Very good.  Welcome.

18           MR. HAGLUND:  We're prepared now to proceed with the

19  oral argument on our motion.

20           THE COURT:  All right.  You may.  And let me remind

21  you I really have read everything.  I understand the issues.

22  With that said, you may give me any further argument.

23           MR. HAGLUND:  Bearing in mind that admonition,

24  Your Honor, I'll try to be as brief as I can.

25      As you know from our papers, Coast Cutlery is a nearly

1   100-year-old company.  Mr. Brands is the third generation now

2   running the company founded by his grandfather.  They've

3   been -- we -- the record in this case shows that the portable

4   light product market was a bit of a wild west in the early

5   years, and then comes standards, as you often see in new

6   markets, and those have been provided by ANSI.  There's also --

7   PLATO is the trade organization that tries to be a -- something

8   of a resource for addressing false advertising issues, but it's

9   got limited capabilities.

10      We -- I think the record is reasonably clear that in the

11   declaration, particularly from Mr. Windom, that Coast was very

12   hopeful that the PLATO process, which made Simple Products

13   Corporation, SPC, aware of the significant differences between

14   their represented attributes and what the test results showed,

15   and Coast was hopeful what would solve this problem.  It

16   hasn't.  That is what has forced this litigation.

17          THE COURT:  If I understand correctly, PLATO can give

18   us the form of a perfect flashlight, but it can't enforce

19   deviations from it?

20          MR. HAGLUND:  That's correct.  They've got this

21   voluntary procedure, and if you -- if you're a maker of

22   flashlights and you don't really want to respect it or conform

23   to comments that they're making, that's -- they're not vested

24   with enforcement power, and that's why we're now in federal

25   court.

1        We've got a Lanham Act claim and a tortious interference

2   claim.

3        In terms of our preliminary injunction, you know the four

4   criteria that we've got to meet, and I'm not going to recap

5   those --

6            THE COURT:  Well, I think we better spend a little

7   bit of time on that because you're asking for a mandatory

8   injunction, not a negative injunction, and doesn't that raise

9   the bar substantially?

10           MR. HAGLUND:  We would agree that it does.  We've got

11  to show a significant -- a substantial likelihood of success on

12  the merits, irreparable harm, balance of equities tipping in

13  our favor, and the public interest favor in the injunction.

14           THE COURT:  No.  That's just for a standard

15  preliminary injunction.  Because you're seeking a mandatory

16  preliminary injunction, you have to go further.  You have to

17  show that the law and facts clearly favor your position, and,

18  because it's mandatory injunction as opposed to a prohibitory

19  injunction, that does more than just try to preserve status

20  quo, that significantly raises the bar.

21       I mean, you know, defendant talks about, on page 18 of

22  their brief -- you don't respond to it in your reply --

23       Mary, would you give both counsel copies of this opinion?

24       Although, defendant talks about an older Ninth Circuit

25  case, and there were -- you know, that case is all right, this

1  case that I'm handing you is from 2015, and it says the same

2  proposition.  This is *Garcia v. Google*.  That's 786 F.3d at

3  733.  Ninth Circuit.  2015.  If you take a look at page 740,

4  after describing the standard four factors that you just

5  described, Mr. Haglund, it says, at the bottom of that first

6  column, "Garcia's burden here is doubly demanding:  Because

7  Garcia seeks a mandatory injunction, she must establish that

8  the law and facts" -- and the Ninth Circuit italicizes this --

9  "clearly favor her position, not simply that she is likely to

10  succeed."

11      So if you came here seeking a normal prohibitory or

12  negative injunction, your first factor would be that you're

13  likely to succeed on the merits; but, because you're seeking a

14  mandatory injunction, you have to show that the law and facts

15  clearly favor your position.

16      As explained in the next paragraph, this is a

17  significantly higher burden, and I -- you know, the defendant

18  addressed that, as I said, page 18, with some older cases.

19      This case is consistent with that.  I didn't see a

20  response in your reply brief to this point, but I'm going to

21  say is -- my legal ruling is when you seek a mandatory

22  injunction it is a substantially higher test than the test for

23  a negative injunction.  And the negative injunction, even by

24  itself, is an extraordinary remedy that's not easily granted;

25  but, here, the mandatory injunction raises the bar

1   substantially.

2          MR. HAGLUND:  We would acknowledge that, Your Honor,

3   and we do not quibble with the authority that you have made

4   available here.

5          THE COURT:  Okay.

6          MR. HAGLUND:  And, frankly, because of the way in

7   which the defendant has responded, with lots of their own tests

8   that are designed to contest the tests that we have provided,

9   we would acknowledge that the -- it makes it significantly

10  harder for us to hit that standard.

11         THE COURT:  Okay.

12         MR. HAGLUND:  And the alternative that we would like

13  you to very seriously consider as a way of facilitating the

14  ultimate resolution of this case is what we suggest in our

15  reply brief, and that is that you order -- and I -- either

16  as -- appoint as a special master or craft an order that

17  requires that the products that we claim are inconsistent and

18  are being falsely advertised -- even today, where you go to the

19  store and -- you know, this was done most recently in April.

20  That's just a few months ago.  And we would be agreeable to

21  Intertek, in New York, which it appears both sides are in

22  agreement or have the same view, that they are a quality

23  laboratory, and we believe that the resolution of this case

24  would be greatly advanced if Intertek would be appointed as

25  either a special master or some other label, that you would

1   decide, and the parties worked together to craft the precise

2   protocol where they are doing it according to the ANSI

3   standards.

4       They're getting these not from either party but from local

5   retailers, from the internet, testing a given number of these

6   products.  Coast is willing to bond or pay for that as an

7   assist to getting to the point where you are in a position to

8   make a decision about whether there should be an injunction

9   against the continued false advertising on their packaging.

10          THE COURT:  Let's hear defendant's response to that

11  suggestion.

12      Mr. Bettilyon, or anyone else, what's defendant's response

13  to that?

14          MR. BETTILYON:  Your Honor, do you mind if I use --

15          THE COURT:  Whatever you wish.  Although, you know

16  I'm not asking for a full-blown oral argument right now.  My

17  question is what's your response to what Mr. Haglund just said.

18          MR. BETTILYON:  To the court-appointed issue?

19          THE COURT:  Yes.

20          MR. BETTILYON:  First of all, I think defendant has

21  just admitted that they don't have nearly the kind of evidence

22  they need to file this motion, and so this is --

23          THE COURT:  That's not the question.  We'll get there

24  if and when we need to.

25          MR. BETTILYON:  My apologies.  I'll go right to the

1    issue.

2          Under Rule 706, Your Honor, the first thing they would

3    need to do is file a motion.  They have not yet done that.

4    They put it in a reply memorandum, and I don't think that's

5    appropriate.

6          THE COURT:  Let me ask it again.  I apologize because

7    my question was not sufficiently clear.  I really wasn't asking

8    for an argument against that request.  I was intending to ask,

9    and let me be more precise --

10          MR. BETTILYON:  Oh, I'm sorry, Your Honor.

11          THE COURT:  -- would defendant agree to that position

12    that Mr. Haglund suggested of we'll find some way of having an

13    agreed-upon third party, whether it be, you know, the New York

14    office of Intertek, or something, play some type of role, maybe

15    a special master role, with an agreed-upon protocol, on how the

16    parties can move forward at least between now and the end of

17    trial?  Is that something that defendant is willing to

18    consider?

19          And I think right now the answer is yes or no.

20          MR. BETTILYON:  The answer is no, Your Honor.

21          THE COURT:  Okay.  Then you can sit down again.

22          MR. BETTILYON:  I'm sorry.  I thought you wanted more

23    of a --

24          THE COURT:  It was my fault.  I wasn't specific

25    enough.

1          MR. BETTILYON:  I think you were.  My apologies.

2     Sorry.

3          THE COURT:  Mr. Haglund, here's the problem with that

4     suggestion that otherwise has some intrigue -- it's intriguing,

5     but here is the problem with it:  In the absence of an

6     agreement by defendant to do something like that, perhaps with

7     the authority of the Court or something like that, I can't

8     order them to do that.  I can't order them to do anything

9     affirmative unless I find that the standard for a mandatory

10    preliminary injunction is satisfied; and, if it's not satisfied

11    and if they don't agree to this approach, I can't go that far

12    and even order them to submit their products to this third

13    party and do whatever is an appropriate consequence that you

14    may be suggesting from that.

15         So it's an intriguing idea and, if the parties wanted to

16    do that voluntarily, by agreement, and if they wanted some type

17    of imprimatur of the Court or blessing, I would certainly

18    consider what.  But, in light of defendant's opposition, I

19    can't affirmatively order them to do something unless I find

20    that the standard for a mandatory injunction has been

21    satisfied.

22         In light of their response, mostly by the Christensen

23    declaration, at least the first one -- I haven't even looked at

24    the second one, but the first one -- and the wide variability

25    of test results, I don't think that plaintiff is going to meet

1    that high standard at this stage.

2          That said, I am very sympathetic to the other arguments

3    that plaintiff makes, including possibility of irreparable

4    damages or maybe a probability of irreparable damages, the

5    importance of basically making sure that the marketplace has

6    the right information.  So what I think I -- I think really the

7    only thing that's left for me to do, if I can't grant that

8    mandatory injunction with the evidence that I have before me,

9    is to basically set an accelerated trial date on the merits.

10          I don't know whether folks are looking for a jury trial or

11    a bench trial or a combination of money damages plus injunctive

12    relief, if appropriate, which would have a hybrid, but I'm very

13    open to plaintiff telling me how long you think you will need

14    to prepare for trial on the merits.  We'll get this case to a

15    trial on the merits relatively efficiently and quickly, and

16    then if I find that the plaintiff is right and you're entitled

17    to a permanent injunction, I issue a permanent injunction.  But

18    I think that's the only way I can proceed in light of

19    defendant's position that they won't agree to a special master.

20                MR. HAGLUND:  Your Honor, we would be very open to --

21    and, in light of your tentative rulings, we believe the only

22    appropriate course is to get an accelerated trial date.  We

23    would be open to trying the case in November and putting the

24    resources into getting discovery and any depositions done in

25    the next 60 days.

```
 1              THE COURT:  Okay.  If we were to -- by the way, am I
 2   correct in that you would be seeking both --
 3              MR. HAGLUND:  It would be a combination trial.  We
 4   would be seeking --
 5              THE COURT:  Money damages and injunctive relief?
 6              MR. HAGLUND:  Correct.
 7              THE COURT:  Okay.  What's defendant's position on
 8   whether a November trial date is appropriate?
 9              MR. BETTILYON:  Your Honor, we're going to need more
10   time than that.  I think, in fairness, there are a lot of
11   witnesses that need to be deposed.  There are a lot of -- we
12   need to go find some experts that can help us with some of
13   these testing results.  There is just a lot to do, and I don't
14   see how that is really even possible, in all honesty.
15              THE COURT:  How long do you -- you know that I'm now
16   very much interested -- you know that I'm very strongly leaning
17   towards denying the motion for a preliminary injunction.
18              MR. BETTILYON:  I understand that.
19              THE COURT:  But, in exchange, I'm very interested in
20   allowing an expedited trial.  How long do you think it would
21   realistically take in order to be prepared for an expedited
22   trial?  We won't let this drag out very long.
23              MR. BETTILYON:  I would say -- can I consult with
24   the --
25              THE COURT:  You may.  As a matter of fact, you want
```

1   to take a five-minute recess and consult?

2            MR. BETTILYON:  Sure.  Thank you.

3            THE COURT:  And we'll see where we are.

4            MR. BETTILYON:  Thank you.

5            THE COURT:  By the way, before we do that,

6   Mr. Bettilyon, there's just one detail that I just wanted to

7   clean up.  Since I'm not going to grant the motion anyway, but

8   I -- probably not that important, but I was confused about one

9   aspect of Mr. Christensen's declaration, and that is in a

10  number of paragraphs he states that Intertek tested run time.

11  I think mostly in October of 2015.  And he lists some various

12  results for run times based on the Intertek test results.

13       When I look at the various exhibits that were attached and

14  I look at the Intertek reports -- and I can show you what I'm

15  talking about if you can't answer this from this level of

16  generality -- the Intertek reports only list lumens test

17  results.  I don't see, for a number of entries, where

18  Mr. Christensen, in his paragraphs, give me various run time

19  results, where he gets that from, from Intertek.

20       So either I'm missing something or there's some conversion

21  that he makes from lumens, which was tested by Intertek, to run

22  time.

23       Do you know the answer to that question?

24            MR. BETTILYON:  I don't, as I'm standing here; but

25  perhaps on the break I can get an answer for you.

1          THE COURT:  Thank you.  If you need details, I'll be

2     glad to give it to you; but the Intertek reports list basically

3     lumens test results.

4          Mr. Christensen, in his declaration, you'll see at

5     paragraphs 42, 93, 105, and 106, he tells me, for those

6     Intertek, October of 2015, reports, not only lumens results but

7     also run time results, and I just can't figure out where he

8     gets the run time results.

9          MR. BETTILYON:  Your Honor, maybe one thing I can ask

10    you before we take this break:  We believe we're going to have

11    some counterclaims what we are going to bring.  I mean, I don't

12    think I'm surprising you.  We have these test results.  So I

13    guess a question I have for you is we're going to be doing a

14    combined -- I guess we're just doing one trial; correct?

15         THE COURT:  It depends on whether or not somebody

16    asks for a bifurcation and whether or not someone on the other

17    side opposes it.

18         MR. BETTILYON:  Let me --

19         THE COURT:  Here is another possibility that we can

20    do, and I don't mean to really accelerate everything to five

21    minutes.  We can take a break if you want.  But let me present

22    this to you all and tell me what you want to do.  We could take

23    a break and talk about scheduling now or you've got a lot of

24    decision makers in this room, and I'll give you the courtroom

25    for the rest of the day.  I don't have any more hearings for

 1   the rest of the day.  You can talk among yourselves about a

 2   schedule or a calendar that both sides can reasonably live

 3   with.  That might very well include defendant filing

 4   counterclaims.  You can obviously tell plaintiff what those

 5   counterclaims might be.  Although, from the sound of some of

 6   your cross-examination, it's pretty obvious what at least some

 7   of them might be.  And then both sides can talk over some type

 8   of expedited discovery.

 9       When both sides realistically or reasonably think you can

10   get this case ready for a trial, either just on plaintiff's

11   claims and we'll bifurcate the counterclaims or on both if you

12   can agree, and one thing you can do is maybe start the

13   conversation now and either let me know today or maybe we'll

14   have a telephone conference latter -- maybe in a week from

15   now -- you know, latter part of next week -- or if you have a

16   stipulated schedule, you know, send me something; but I'll try

17   to move things around to give you the time that you all need.

18       There's a couple of criminal trials coming up that I

19   really can't move, but a lot of everything else I can move

20   things around and make a priority for you all.

21       Because you're sensing on the one hand -- I'll just say it

22   right now.  I'm denying the motion for preliminary injunction

23   for reasons that I'll state in an opinion to follow, but I'm

24   going to get this case resolved sooner rather than later, on a

25   faster time table rather than a slower one, because I recognize

1    plaintiff has some legitimate interest in getting a resolution

2    to these important issues.

3        I will do it in such a way that doesn't deny defendant of

4    their due process rights to take adequate discovery and be

5    adequately prepared, but I'm prepared to push things along.

6        You've heard of the Eastern District of Virginia's rocket

7    docket.  That's where I started trying cases.  I'm not that

8    fast, but I am going to move this quickly.  So why don't you

9    take five minutes, talk among yourselves.  But if you don't

10   resolve anything now and you think it's a good idea for maybe

11   more consultation between the parties, then we'll schedule a

12   telephone conference for next week or something.  Let me know

13   that too.

14       I'll come back in about five minutes.

15           MR. BETTILYON:  Thank you, Your Honor.

16           MR. HAGLUND:  Thank you, Your Honor.

17                     (Recess taken.)

18           THE COURT:  Did I give you all enough time?

19           MR. HAGLUND:  I think it was enough time for us to

20   develop our respective positions which don't mesh.

21           THE COURT:  Okay.  Where are we?

22           MR. HAGLUND:  We would like to make sure that we get

23   the trial accomplished by the end of the year, Your Honor.

24   There's a -- there's a line review by Lowe's in the early

25   spring.  Companies have to do a lot of planning for that.  If

1    we could get these issues resolved before the end of the year,

2    then that -- the 2017 sales year is really in a position where

3    it's not impacted by continuing damage to Coast Cutlery from

4    this false advertising.

5        We think you have the discretion, under these

6    circumstances, to set the trial date and have us, just the

7    lawyer -- I mean, we're both with -- these are not solo

8    practitioner firms.  We both have the resources to get the case

9    adjudicated by the end of this year.  They would like April,

10   and that just is too far down the road for us.

11            MR. BETTILYON:  Your Honor, here is where we are:

12   They've had two years to test all of our products.  They've had

13   this two-year head start and now they come to you and say, "We

14   have an emergency situation."

15       They don't have an emergency situation.  They haven't

16   shown irreparable harm.  There's no evidence in the record that

17   really shows any kind of irreparable harm.  Their sales have

18   gone up.  They have other competitors in the marketplace that

19   sell these same products.  If we're not in the marketplace,

20   they're not going to buy Coast Products because they're twice

21   as expensive as all of the other competitors.  And, yet, what

22   they want to do is they want to prevent us from having the same

23   amount of time or any amount of time to go have their products

24   properly tested and have a fair trial where everybody gets to

25   see that, you know, these tests -- because, at the end of the

1   day, Your Honor -- I haven't been doing this for very long, but

2   I think the testimony you've heard today, if one thing rings

3   loud and clear, it's that there's going to be a lot of

4   differences between different people who test these products.

5        And I think the jury clearly is entitled to know that

6   Coast Products don't pass these tests any better than the other

7   products do or don't, and I think, at the earliest, Your Honor,

8   we could do this is in April, and I -- I think even that, in

9   all honesty, is pushing it.

10       I mean, these are important issues.  The lifeblood of this

11  company.  And you have a client -- you have a customer here in

12  your courtroom who has said, "I've had two years to look at

13  this and I've gone and" -- Your Honor, I'll tell you they've

14  been talking to customers about this because we know that, and

15  that's going to come out in the evidence.  They go talk to

16  customers about it and then, as a last resort, they come to

17  court and say, "I want a trial in 30 days; 60 days; 90 days."

18  That isn't fair.  That's not the way the judicial system works.

19       At a minimum, we need until April, if not later, Your

20  Honor.

21            THE COURT:  How long do you think trial will last?

22            MR. HAGLUND:  I would think one week, Your Honor.

23            MR. BETTILYON:  I think at least a week, and I can

24  see two weeks.  I think we ought to plan on two weeks.

25            THE COURT:  Well, I push things along very quickly.

1    I also use chess clocks in civil cases, and it works really

2    well.  So I'll set it for five days, and we'll see how things

3    look when we get closer.

4        Mr. Haglund, you're in the Murphy v. Westerlund case,

5    right, that starts April 24th?

6                THE COURT:  Yes, Your Honor.

7                THE COURT:  That's 12 days.  I suppose if I ask you

8    is that likely to go, you're going say yes; or at least based

9    upon your understanding right now --

10                MR. HAGLUND:  My understanding right now, yes.  I'm

11   hopeful that will change, but right now I have to say yes.

12                THE COURT:  Okay.  I'm thinking that the March 20th

13   case is very unlikely to go or I can give that to another

14   judge.

15        Maybe I'll split the difference with you and give you

16   seven days.  I'll give you each a little bit of what you want

17   and nobody everything that you want.

18        I'm setting trial in this matter for March 14, 2017.

19   That's a Tuesday.  9:00 a.m.  I'll set it for seven days to a

20   jury.

21        Then I would like to have a pretrial conference about two

22   weeks before then.  So maybe -- if March 14th goes, I'll ask

23   another judge to cover it.  The trial on March, don't tell

24   them, but it looks pretty simple and easy, and it's a shorter

25   trial.

1          So March 14, 2017.  Pretrial conference about two weeks

2    before, give or take.  How about a pretrial conference exactly

3    two weeks before?  That will be Tuesday, February 28th, at,

4    say, 1:00 -- let's say 2:00 p.m.

5          Mr. Haglund, you're better at putting 2:00 p.m. in your

6    calendar than 1:00 p.m.; right?

7                    MR. HAGLUND:  Apparently, Your Honor.

8                    THE COURT:  All right.  Now, obviously, I know that

9    defendant may be concerned that that rushes them too much; but

10   it rushes you less than early November.  Any particular

11   problems that you know of with those particular dates?

12   Anybody?

13                   MR. BETTILYON:  I'm not aware of any.

14         Again, I want to just make it clear on the record, Your

15   Honor, I think that's way too soon.  I think I'm being

16   prejudiced by the fact that the defendant -- the plaintiff has

17   had two years to test products, and we're being here at -- I

18   just -- I don't see the fairness in that, and I would prefer,

19   really, frankly, to have this in May, as opposed to March, if

20   you have a date in May.  I just think that would be -- I mean,

21   I -- we need a lot of time.  There's a lot of stuff.

22         We have many technical experts, Your Honor.  We're going

23   to have marketing experts.  We're going to have to have

24   technical experts.  There aren't that many technical experts

25   that deal with these kind of flashlight things.  We've had a

1   hard time, frankly, finding ones that we can use.  I think the

2   prejudice is high and the business -- it's a make-or-break

3   issue.  You're essentially proposing to shut down a business if

4   we lose this trial, and I think my client is entitled to more

5   time, and I urge, if you can find a date in May, that that

6   would be better.

7            THE COURT:  Okay.  Mr. Haglund, let me ask you, since

8   you're not going to get it in November or by the end of this

9   year, does it matter to you, or your client, whether it's the

10  middle of March or sometime in May?

11           MR. HAGLUND:  Well, yes, it does, Your Honor.  It's

12  really important to get this resolved as quickly as possible.

13  There's continuing harm to the company's reputation.  That is

14  viewed as irreparable as well as the loss of competitive

15  position.

16      I think that the defense is exaggerating the need for that

17  much time.  March is -- is eight, nine months from now.  That's

18  a significant period of time to get a lot done with capable

19  lawyers, and it's slower than the rocket docket.  It's -- you

20  know, in this district we're known for disposing of cases on

21  faster-than-average time tables compared to other states, and

22  here it's well justified to get this reasonably -- it's just

23  slightly expedited over what would otherwise be typical.

24           THE COURT:  I do think it would be unfairly

25  prejudicial to defendants to force them to go to trial in

1   November, so I won't order that.  But the trial date is

2   March 14, 2017.  Set for seven days to a jury.  Pretrial

3   conference is February 28th, 2:00 p.m., and I'm directing that

4   the parties confer on a proposed pretrial schedule.

5        Mr. Haglund, you take the lead in filing a status report.

6   I think within two weeks from today.

7             MR. HAGLUND:  Okay.

8             THE COURT:  So confer so that everyone is clear on

9   deadlines for filing any answers and counterclaims, responses

10  to counterclaims, however you -- both sides can agree upon

11  close of fact discovery, expert report exchanges, dispositive

12  motions.  You talk about -- each side can talk about, to the

13  other, what you need to do.  Work backwards from these

14  deadlines.

15       If you all can agree, I will approve whatever you all

16  agree upon.  If you can't agree, give me a single report, a

17  single status -- joint status report where we see plaintiff

18  proposes this and defendant agrees to that but not to the other

19  thing and here is why, and let me know what you each propose,

20  keeping in mind that the first round of pretrial documents are

21  due four weeks before the pretrial conference.  So that's

22  essentially January 31st or whatever four weeks is before

23  February 28th.

24       So all of the decisions need to be done, all of the

25  discovery needs to be done so that everyone knows where we are

1   come the end of January.  You should build in the following if

2   there's going to be any dispositive motions:  I want at least

3   five days, including a weekend, from when the reply brief is

4   filed to when I'm doing an oral argument, and then you can

5   assume that I will get you a decision within one week after

6   oral argument.

7       By the way, if you don't have a meritorious motion for a

8   dispositive motion, don't file one.  You know, I know what a

9   fact dispute looks like.  So if you have important legal

10  questions you need me to resolve, by all means, do it; but if

11  there's fact questions, I'm going to deny a motion that

12  presents a genuine issue of fact.

13      And so, Mr. Haglund, you take the lead in filing that

14  within two weeks.  But, obviously, both sides have to confer on

15  that type of schedule.

16          MR. HAGLUND:  Sure.

17          THE COURT:  When you're mapping that out, if you

18  change your mind and you're willing to go a little bit later,

19  let me know that too; but, if you're not, we'll stick with this

20  schedule.

21          MR. HAGLUND:  Okay.

22          THE COURT:  All right.  I'll get an opinion out.  I'm

23  denying a motion for preliminary injunction, and we'll get a

24  opinion out explaining why.

25      Did you have an answer, by the way, on Mr. Christensen?

1          MR. BETTILYON:  I do.  Yeah.  There was a lot of talk

2     in this cross-examination about extrapolation.  There was no

3     extrapolation, Your Honor.  The -- if you look -- I'll just

4     show you one exhibit.  They're all the same.  Exhibit 9, if you

5     have it in front of you --

6          THE COURT:  Let me get it here.

7          MR. BETTILYON:  -- the run time high, which is just

8     down -- is 150 minutes, and it's -- it says "electrical rating"

9     on the one --

10          THE COURT:  I'm sorry.  Which page should I look at

11     on Exhibit 9?

12          MR. BETTILYON:  It's the very first page of

13     Exhibit 9.

14          THE COURT:  Yeah.

15          MR. BETTILYON:  You see "electrical rating" and then

16     at the other side of that line it says, "run time high 150

17     minutes."

18          THE COURT:  Right.

19          MR. BETTILYON:  So that's the -- that's the result.

20          THE COURT:  One second.  First page.  Okay.  So I

21     guess I was looking for it on page 3 where it says "test

22     report."

23          MR. BETTILYON:  Correct.

24          THE COURT:  "Performance test result," and I didn't

25     see anything about run times there.

1          MR. BETTILYON:  It's on the first page.

2          THE COURT:  Okay.

3          MR. BETTILYON:  I can't tell you why, but that's --

4          THE COURT:  See, I thought -- do you see to the left

5     of that column where it says "electrical rating"?

6          MR. BETTILYON:  Yes.

7          THE COURT:  I thought that was, like, the rating for

8     something as opposed to the results of a test.

9          MR. BETTILYON:  That's what I'm -- this is my

10    understanding, Your Honor.  We're relatively new on these

11    issues, but it's my understanding that that is the run time

12    results, and it's right there, and that's what we relied on.

13         THE COURT:  Okay.  I'm not going to worry about it

14    where we are right now.

15         MR. BETTILYON:  Okay.

16         THE COURT:  Okay.  Is there anything else anyone

17    would like to discuss at this time?

18         MR. HAGLUND:  No, Your Honor.

19         THE COURT:  Mr. Bettilyon?

20         MR. BETTILYON:  No, Your Honor.

21         THE COURT:  Thank you, all, very much.  I appreciate

22    the excellent advocacy both in writing and orally.  Thank you.

23                    (Hearing concluded.)

24

25

1                     C E R T I F I C A T E

2

3        Coast Cutlery Co. v. Simple Products Corporation

4                        3:16-cv-00824-SI

5                          ORAL ARGUMENT

6                          July 22, 2016

7

8            I certify, by signing below, that the foregoing is a

9    true and correct transcript of the record, taken by

10   stenographic means, of the proceedings in the above-entitled

11   cause.  A transcript without an original signature, conformed

12   signature, or digitally signed signature is not certified.

13

14   /s/Jill L. Jessup, CSR, RMR, RDR, CRR

15   _____
     Official Court Reporter      Signature Date: 8/29/16
16   Oregon CSR No. 98-0346       CSR Expiration Date:  3/31/17

17

18

19

20

21

22

23

24

25